[No. 37199. En Banc. March 26, 1964.]

LOUIS ROUSSO, *Petitioner,* v. VICTOR A. MEYERS, *as Secretary of State et al., Respondents.*\*

\*Reported in 390 P. (2d) 557.

*Morrissey & Hedrick* and *Willard S. Howard,* for petitioner.

*The Attorney General, Robert J. Doran, Chief Assistant,* and *Philip H. Austin, Assistant,* for respondents.

ROSELLINI, J.—The petitioner instituted this action to restrain the Secretary of State and others acting under him from placing referendum measure No. 34 on the November 3, 1964, general election ballot. Dr. Homer W. Humiston, proponent of the measure, intervened as a re-

spondent. The trial court granted the respondents' motion for summary judgment, dismissing the action, and the petitioner applied for and obtained a writ of certiorari.

Amendment 7, Art. 2, § 1, of the Washington Constitution provides:

"The legislative authority of the state of Washington shall be vested in the legislature, . . . but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature.

" . . .

"(b) . . . The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted.

. . .

"(d) . . . Referendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety days after the final adjournment of the session of the legislature which passed the measure on which the referendum is demanded. . . . All such petitions shall be filed with the secretary of state, who shall be guided by the general laws in submitting the same to the people until additional legislation shall especially provide therefor. This section is self-executing, but legislation may be enacted especially to facilitate its operation. . . ."

Amendment 30 changes the number of signatures required upon petitions for initiative or referendum measures.

In accordance with the authorization contained in Amendment 7, the legislature has provided certain procedural steps to be followed in obtaining a referendum. These steps are set forth in RCW chapter 29.79. RCW 29.79.120 provides that, when a specified number of signatures of legal voters has been obtained, a petition may be submitted to the Secretary of State for filing; and RCW 29.79.140 re-

quires that the petitions be filed not later than 90 days after the final adjournment of the session of the legislature which passed the act. Other provisions pertinent to this action are:

RCW 29.79.190 "If the secretary of state accepts and files an initiative or referendum petition upon its being submitted for filing, . . . he shall forthwith . . . detach the sheets containing the signatures and cause them all to be firmly attached to one or more printed copies of the proposed initiative or referendum measure in such volumes as will be most convenient for canvassing and filing, and shall number such volumes and file the same and stamp on each thereof the date of filing."

RCW 29.79.200 "Upon filing the volumes of an initiative petition proposing a measure for submission to the legislature at its next regular session, the secretary of state shall forthwith in the presence of at least one person representing the advocates and one person representing the opponents of the proposed measure, should either desire to be present, proceed to convass and count the names of the registered voters thereon. If he finds the same name signed to more than one petition he shall reject the name as often as it appears. . . ."

RCW 29.79.220 "Upon filing the volumes of a referendum petition or an initiative petition for submission of a measure to the people, the secretary of state shall canvass the names of the petition within sixty days after filing and like proceedings shall and may be had thereon as provided in RCW 29.79.200 and 29.79.210."

RCW 29.79.230 "If a referendum or initiative petition for submission of a measure to the people is found sufficient, the secretary of state shall . . . certify to each county auditor the serial numbers and ballot titles of the several initiative and referendum measures to be voted upon at the next ensuing general election or special election ordered by the legislature."

RCW 29.79.240 "The secretary of state shall, while making the canvass, keep a record of all names appearing on an initiative or referendum petition which are not registered voters and of all names appearing thereon more than once, and shall report the same to the prosecuting attorneys of the respective counties where the names were signed to the end that prosecutions may be had for such violations of this chapter."

The legislature enacted Laws of 1963, chapter 37, which is entitled:

"AN ACT relating to the maintenance and operation of certain machines or mechanical devices, salesboards, bingo equipment and cardrooms in certain governmental subdivisions; adding new sections to chapter 249, Laws of 1909 and chapter 9.47 RCW; and declaring an emergency."

The emergency clause was declared invalid by this court in *State ex rel. Humiston v. Meyers,* 61 Wn. (2d) 772, 380 P. (2d) 735. On the day this decision was published, the respondent Humiston filed the papers necessary to initiate a referendum action against chapter 37, and the Secretary of State thereafter identified such filing as referendum measure No. 34. The Attorney General issued an official ballot title, and thereafter petition sheets bearing signatures of purported registered voters were filed with the Secretary of State. The 90 days within which such petition sheets could be filed expired on June 12, 1963. On June 17, 1963, the permanent registration division staff completed the following procedural steps:

1. Sorted the petition sheets by counties in which the majority of signers resided;

2. Bound 137 volumes of petition sheets, each volume containing approximately 40 sheets;

3. Numbered each page of each volume and numbered each volume;

4. Counted the signatures appearing upon each page and posted the total at the bottom of each page;

5. Posted the total number of signatures contained in each volume upon the cover of each volume;

6. Established that a grand total of 82,955 signatures had been filed and contained in a total of 137 volumes. A letter was written to Dr. Humiston advising him that the Secretary of State's office count revealed that the grand total of 82,955 signatures had been filed and that the canvass of the signatures would start on July 1, 1963. Accompanying this letter was a report of the Secretary of State's count of signatures showing how many signatures came from each

county and the number of volumes representing each county.

On June 21, 1963, as a final procedural step before the actual canvass of signatures was to be made, an employee carefully checked every signature on each page and in each volume for situations beyond the evaluation of temporary checks. As a result of this procedure, it was found that a total of 45 names were compounded, that is, in 45 instances, one person had signed for two or more persons, for example, "Mr. and Mrs. Sam Jones." A check of these compounded signatures revealed that in each instance, one of the named persons had actually signed the compounded signature; and each of these was counted as one signature.

On June 24, 1963, the theft of the 137 volumes containing all of the signature petition sheets supporting referendum measure No. 34, was discovered. Two days later the Secretary of State certified the measure to the November 3, 1964, state general election ballot, and this action followed.

The superior court determined that the Secretary of State had made his certification upon sufficient evidence and refused to disturb his action. The petitioner now asks this court to hold that, inasmuch as the Secretary of State did not comply with the provisions of RCW 29.79.220, 230, and 240, quoted above, his certification was invalid.

It is agreed by all concerned that this is a case of first impression, the diligent research of counsel having failed to disclose any case in history wherein a court was asked to determine whether an attempt to obtain a referendum or initiative can be frustrated by the theft of the petitions.

Each party maintains that the court should sustain his position as a matter of public policy, contending that to do otherwise would be to encourage future thefts of voters' petitions. We cannot assume that so gross an outrage to the rights and dignity of the people of this state will ever be repeated, and our decision will not be made to rest upon such a supposition.

■ The question presented is whether impossibility of performance removed the necessity of following the statutory procedural steps, when there was before the Secretary

of State sufficient evidence to justify an ascertainment by him that the petition contained the required number of valid signatures. The evidence showed, and the trial court found, that, in making its determination, the Secretary of State took into consideration three pertinent factors:

(1) He considered that an inference of validity should be drawn in view of the fact that the law imposes criminal sanctions upon one who signs a false name (RCW 29.79-.440), or signs more than one petition sheet (RCW 29.79-.450), or signs when he is not a legal voter (RCW 29.79.460), or makes a false statement as to his residence (RCW 29-.79.470). A warning of these sanctions appears on each petition sheet.

(2) The records and files in his office of past referendum petitions indicated beyond a reasonable doubt that the petitions contained a sufficient number of legal signatures. (The minimum number of signatures required by law was 48,630; the unofficial count showed that the petition contained 82,955 signatures. In the past the highest rejection rate had been 20.21 per cent, and these petitions could have survived had 41.37 per cent of the signatures been rejected.)

(3) No irregularities were discovered during the processing of the petition sheets.

We deem these factors, when taken all together, sufficient to justify the determination made by the Secretary of State. However, the petitioner cites the case of *State ex rel. Evich v. Superior Court,* 188 Wash. 19, 61 P. (2d) 143, and contends that the decision of that case is controlling here.

In that case, petitions for an initiative measure were submitted to the Secretary of State, who certified the measure to the legislature without having completed the canvassing of signatures. The number of valid signatures canvassed was not sufficient to validate the petition, although a preliminary canvass had indicated that there were in excess of 90,000 signatures on the petition sheets. The Senate and the House of Representatives, by resolutions, expunged the measure from their records for the reason that it had been improperly and illegally certified, and returned it to the Secretary of State. The relator alleged that,

notwithstanding these facts, the Secretary of State threatened that he would, unless restrained, certify the measure to the county auditors to be placed upon the ballot to be voted upon at the next election.

This court quoted the initiative provisions of Amendment 7, Art. 2, § 1, referred to the fact that the section is self-executing but authorizes legislation to facilitate its execution, and observed that such facilitating legislation had been enacted. This legislation embodied essentially the procedure which the Secretary of State was unable to follow in this case. We granted the relief asked by the petitioner, holding that the Secretary of State had illegally certified the measure to the county auditors. In reaching this decision, we noted that the partial canvass undertaken by him had indicated that the petition sheets did not contain the requisite number of valid signatures.

The case is distinguishable from this, of course, for there was no contention made in that case that the canvassing of the signatures had been rendered impossible by the act of a third party. The statute was applicable under the circumstances. Here the legislature, in providing a procedure for the determination of the question whether a sufficient number of signatures has been obtained, did not take into account the possibility that referendum petitions might be purloined. There is thus a hiatus in the statute.

■ Those provisions of the constitution which preserve the right of referendum are to be liberally construed to the end that this right may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right. *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 Pac. 461; *State ex rel. Howell v. Superior Court,* 97 Wash. 569, 166 Pac. 1126.

■ Furthermore, Amendment 7 declares that its provisions are self-executing, but that legislation may be enacted especially to facilitate its operation. In the case before us, there is no legislation which facilitates the operation of the constitutional provision. The circumstances

being as they are, the Secretary of State has found himself without a statutory guide; and the constitution itself sets forth no procedure to be followed in ascertaining whether the required percentage of legal voters has signed.

We have no doubt that the Secretary of State would consider it his duty to canvass the signatures in every case, even though no statute required it, but in this case he was called upon to make a decision without the benefit of the exact knowledge which a canvass would reveal. If the correctness of the decision which he made were in any doubt, or if there were a suggestion of fraud or mistake on the part of the proponents, we would hesitate to uphold that decision. But we think, in view of the fact that the evidence supporting the decision was undisputed and overwhelming, and there is no element of fraud or mistake involved, the intent and purpose of the framers of the constitution, in reserving the power of referendum, can be given effect only if his decision is sustained.

The judgment is affirmed.

OTT, C. J., FINLEY, HUNTER, HAMILTON, and HALE, JJ., concur.

WEAVER, J. (concurring in the result)—The majority opinion paints with a brush slightly wider than I would use. I agree, therefore, only in the result reached by the majority opinion, for I seem to sense a veiled conclusion that since there is a hiatus in the statute, it becomes the function of the judiciary to fill the void. I challenge the validity of this thesis.

My thoughts are so well expressed in a recent address of Mr. Justice Harlan of the United States Supreme Court that I quote extensively from his remarks.[1]

"One of the current notions that holds subtle capacity for serious mischief is a view of the judicial function that seems increasingly coming into vogue. This is that all deficiencies in our society which have failed of correction by

---

[1]Address delivered at the American Bar Center August 13, 1963. Published in 86 New Jersey Law Journal 505 (September 19, 1963); 49 American Bar Association Journal 943 (No. 10; October, 1963).

other means should find a cure in the courts. The principal theme of these remarks will be to challenge the validity of . . . an urge for quick and uncompromising panaceas for things that call for reform. I venture to say at the outset that this view of the cosmic place of the judiciary is not only inconsistent with the principles of American democratic society but ultimately threatens the integrity of the judicial system itself.

" . . .

" . . . some well-meaning people apparently believe that the judicial rather than the political process is more likely to breed better solutions of pressing or thorny problems. This is a compliment to the judiciary but untrue to democratic principle. That point of view is some times difficult for judges to resist for it carries ostensibly authentic judicial hallmarks—the function of statutory construction and the power of judicial review. If the Congress or a state legislature has passed an inadequate statute why should it not be revised by judicial construction? If the statute is one that is manifestly unwise, harsh, or out-of-date, why should it not be abrogated by the exercise of the power of judicial review? . . .

"The objections to such alluring but deceptive plausibilities are more deepseated than might appear at first blush. For in the end what would eventuate would be a substantial transfer of legislative power to the courts. A function more illsuited to judges can hardly be imagined, situated as they are, and should be, aloof from the political arena and beholden to no one for their conscientious conduct. Such a course would also denigrate the legislative process, since it would tend to relieve legislators from having to account to the electorate. The outcome would inevitably be a lessening, on the one hand, of judicial independence and, on the other, of legislative responsibility, thus polluting the blood stream of our system of government. We should be on guard against any such deliberate or unwitting folly.

"The late Speaker of the House Sam Rayburn once observed that 'one of the greatest statements that was ever made by anybody was: "Just a minute." ' . . . A judicial decision which is founded simply on the impulse that 'something should be done' or which looks no further than to the 'justice' or 'injustice' of a particular case is not likely to have lasting influence. . . . Our scheme of ordered liberty is based, like the common law, on enlightened and uniformly applied legal principle, not on *ad hoc* notions of what is right or wrong in a particular case. The stability

and flexibility that our constitutional system at once possesses is largely due to our having carried over into constitutional adjudication the common-law approach to legal development."

I cannot agree with the statement in the majority opinion that

". . . We cannot assume that so gross an outrage to the rights and dignity of the people of this state will ever be repeated, . . . ."

It is not our function to make or deny such an assumption. A repeat performance of that which has happened is always a possibility. "Those who cannot remember the past are condemned to repeat it."

Nor can I agree with the rationale of the dissent. If used as judicial precedent it might well place a premium upon incompetence and malfeasance.

My concurrence in the result is based upon this: The factual impossibility of the Secretary of State to comply with the statutes does not, ipso facto, render the constitutional provision nugatory.

In 1912, when Amendment 7 was adopted, there were those who opposed legislation by initiative and referendum. A careful reading of the entire amendment discloses a particularity of method that leaves no doubt about the purpose and intent of the proponents of the system. The amendment was not to become an unenforceable provision of the constitution (illustrated by Const. Art. 2, § 3), dependent upon the whim of the legislature. It provides that the Secretary of State

". . . *shall be guided by the general laws in submitting the same* [initiative or referendum measures] to the people until additional legislation shall especially provide therefor. *This section is self-executing,* but legislation *may* be enacted especially to facilitate its operation. . . ." (Italics mine.)

The efficacy of Amendment 7 does not depend upon its implementation by the legislature. As the trial court said: "The statutes are effective only insofar as they facilitate the action of the self-executing constitutional provisions."

The factual pattern of the instant case is bizarre and fantastic. We are in the same position this court would have been in had the legislature refused to pass implementing legislation.

The reasons advanced by the Secretary of State in support of his certification are, I believe, sufficient in the *instant case* to support the trial court's conclusion; but the decision is *sui generis* and should not, to my mind, be considered as judicial precedent necessarily applicable to an analogous situation.

HILL, J., concurs with WEAVER, J.

HILL, J. (concurring specially)—While I have signed Judge Weaver's concurring opinion, it seems to me that an analysis of the Initiative and Referendum Amendments (7, 26, 30, and 36) and our statutes should be made to indicate where changes or additions are necessary, at least so far as referendums are concerned.

When a referendum petition has been accepted by the Secretary of State within the 90 days after the legislature has adjourned,[2] it seems clear that the operation of the measure to be referred must be suspended.

The period of the suspension is clear in only one of the numerous contingencies to which references are hereinafter made, *i.e.*, if at the election the measure is approved by a majority of the votes cast thereon and if the total vote cast on such measure equals one-third of the total votes cast at such election, the measure goes into effect on and after the 30th day after said election. This is what the constitution says,[3] and this court, in *Wynand v. Depart-*

---

[2]"The time for submitting initiative or referendum petitions to the secretary of state for filing is as follows:

"(1) A referendum petition ordering and directing that the whole or some part or parts of an act passed by the legislature be referred to the people for their approval or rejection at the next ensuing general election or a special election ordered by the legislature, must be submitted not more than ninety days after the final adjournment of the session of the legislature which passed the act;" RCW 29.79.140(1) (Const. Art. 2, § 1 (amendment 7(d)))

[3]". . . Any measure initiated by the people or referred to the people as herein provided shall take effect and become the law if it

*ment of Labor & Industries* (1944), 21 Wn. (2d) 805, 809, 153 P. (2d) 302, rejected the suggestion that on approval by the people it became effective as of date on which it would have been effective if there had been no referendum.

The contingencies which involve the period of suspension are listed herewith so that, if clarification is deemed necessary by further amendment or legislation, it can be done all at one time and not piecemeal.

*A. The referendum petition may be found to lack sufficient valid signatures* (presumably within the 60 days after filing allowed the Secretary of State for canvassing,[4] and the additional time for reviews by the superior and supreme courts[5]).

---

is approved by a majority of the votes cast thereon: *Provided,* That the vote cast upon such question or measure shall equal one-third of the total votes cast at such election and not otherwise. Such measure shall be in operation on and after the thirtieth day after the election at which it is approved. . . ." (Const. Art. 2, § 1 (amendment 7(d)))

[4]"Upon filing the volumes of a referendum petition or an initiative petition for submission of a measure to the people, the secretary of state shall canvass the names of the petition within sixty days after filing and like proceedings shall and may be had thereon as provided in RCW 29.79.200 and 29.79.210." RCW 29.79.220

[5]"Any citizen dissatisfied with the determination of the secretary of state that an initiative or referendum petition contains or does not contain the requisite number of signatures of registered voters may, within five days after such determination, apply to the superior court of Thurston county for a citation requiring the secretary of state to submit the petition to said court for examination, and for a writ of mandate compelling the certification of the measure and petition, or for an injunction to prevent the certification thereof to the legislature, as the case may be. Such application and all proceedings had thereunder shall take precedence over other cases and shall be speedily heard and determined.

"The decision of the superior court granting or refusing to grant the writ of mandate or injunction may be reviewed by the supreme court on a writ of certiorari sued out within five days after the decision of the superior court, and if the supreme court decides that a writ of mandate or injunction, as the case may be, should issue, it shall issue the writ directed to the secretary of state; otherwise, it shall dismiss the proceedings. The clerk of the supreme court shall forthwith notify the secretary of state of the decision of the supreme court." RCW 29.79.210

QUAERE: When does the measure become effective, there being no valid referendum?

B. *The referendum petitions being stolen, lost or destroyed before the signatures are checked,*

1. The Secretary of State certifies that there were sufficient valid signatures. This is the present case, and whether the measure ever becomes effective will be determined under C and D.

2. The Secretary of State certifies that there were not sufficient signatures.

QUAERE: What happens and when does the measure become effective?

3. The Secretary of State certifies that he cannot tell whether there were sufficient signatures.

QUAERE: What happens; does the measure become effective, and when?

C. *The referendum, having gone to a vote and the votes cast on such measure equaling one-third of the total votes cast at such election,*

1. A majority approves the measure; it becomes effective on and after 30 days after the election.

2. A majority disapproves the measure; it never goes into effect.

D. *The referendum having gone to a vote and the votes cast on such measure not equaling one-third of the total votes cast at such election,*

1. A majority approves the measure.

QUAERE: Does it become effective?

The language of the constitution would indicate that it does not become effective. We have, in such a situation, an act passed by the legislature and approved by a majority of those who voted on it and, yet, the result is the same as though a majority had voted against it under the C-2 situation. We can but wonder whether the proviso should be applicable to referendums.

2. A majority disapproves the measure. (Actually, there is no difference in result between D-1 and D-2.)

Attempting to speak for no one but myself, it would seem that under our present constitutional provisions a referen-

dum petition having been filed by the Secretary of State, the operation of the measure sought to be referred remains suspended until either A, *supra* (it is determined that the petitions lack adequate voter signatures), or C-1, *supra,* a majority of the voters approve the measure. (The votes cast on the measure equaling one-third of the total votes cast at the election.)

FINLEY, J. (concurring specially)—Despite its three-alarm context and the high decibel rating of the dissent, and despite other legal argumentation contrary to the majority, I have signed that opinion. It presents in my judgment a basically acceptable rationalization of the jurisprudential problem involved in this appeal. In other words, proceeding ever so slightly from the general to the particular, and perhaps elaborating the obvious briefly, I think the decision is a sound, necessary, and proper one. It is decided on the particular facts of this particular case; furthermore, in terms of probabilities, it seems to me quite likely this decision is *sui generis.*

The foregoing should and would end the matter for me, except that I am concerned about some possible loose ends or inferences generated by some things said, and others perhaps unsaid, in the opinions written in the disposition of this appeal.

The opinion written for the majority by Judge Rosellini states that there is a hiatus in the legislation enacted to implement the referendum provisions of the state constitution. It is implied that the legislature should have provided some alternative and practical formula for the Secretary of State to follow in certifying as to the number of voters' signatures and the legal efficacy of referendum petitions filed with the Secretary of State, but subsequently stolen, as in the instant case, prior to completion of the mechanical process of counting and canvassing.

The majority opinion in effect concludes that the courts will not permit such a legislative omission or hiatus to negative or defeat the self-executing referendum provisions of the state constitution. This is interpreted in the opinion

by Judge Weaver (concurring in the result) as a statement by the majority that this court can and will fill the legislative void or hiatus. Judge Weaver (apparently joined by Judge Hill) takes very strong exception to the suggestion of such a possibility; but, on the other hand, concurring in the result reached by the majority, states without hesitation:

"My concurrence in the result is based upon this: The factual impossibility of the Secretary of State to comply with the statutes does not, ipso facto, render the constitutional provision nugatory.

" . . .

"The reasons advanced by the Secretary of State in support of his certification are, I believe, sufficient in the *instant case* to support the trial court's conclusion; but the decision is *sui generis* and should not, to my mind, be considered as judicial precedent necessarily applicable to an analogous situation."

In other words, Weaver, J., in effect, seems to be saying that the referendum petitions have been stolen; it is in fact impossible for the Secretary of State to comply explicitly with the canvassing, counting and certification requirements of the existing statutes respecting referendum petition No. 34. But the clear and inescapable inference is that, under the circumstances, the Secretary of State does not have to comply explicitly with the existing statutory provisions, and a conclusion is articulated that the certification as made by the Secretary of State is sufficient. The opinion adds that the conclusion reached should and must be limited to the particular facts in this particular case. Whether articulated or not, this is, of course, the applicable legal theory inherent in the now well recognized and accepted doctrine of stare decisis. Such a limiting statement is good sound judicial orthodoxy and caution, certainly in terms of the more popular forms of judicial discourse employed in just about any case; and I have also taken the precaution to assert this sound principle in the opening paragraph herein.

But the point is, or it seems so to me, that Weaver, J., is saying precisely the same thing as Rosellini, J., but in

slightly different language. Judge Rosellini's statement emphasizes or relates to the inadequacy or absence of specific legislation to authorize or justify the action taken by the Secretary of State, certifying referendum No. 34 in the instant case. Judge Weaver's statement emphasizes or relates to the fact that the petitions are no longer extant, and that the Secretary of State, consequently, cannot comply with the existing statutes; and it is thereupon concluded or decided that the courts should not permit this to defeat the people's right to referendum under the pertinent state constitutional provisions. Neither approach nor opinion mentions, but both suggest, a possible application of the concept of substantial compliance relating to the certification action by the Secretary of State and the existing statutory requirements. Both opinions, obviously, reach an identical conclusion—that the trial court and this court should not exercise judicial discretion, interfering with and enjoining the action of the Secretary of State in certifying as to the legal adequacy of the referendum petitions. So, not only is the end result the same, but the reasoning and legal argumentation or characterization employed seem no more to me than a description of two sides of the same coin, the praiseful comment, citation and quoting of Mr. Justice Harlan to the contrary notwithstanding.

In the latter connection I am tempted to confess some disenchantment with the glittering generalities of the Harlan quotation, and to observe that its last sentence seems to me inconsistent with much of the rest of the quotation, and with other portions of this ostensibly significant opus. The last sentence of the quotation reads:

" ' . . . The stability and flexibility that our constitutional system at once possesses is largely due to our having carried over into constitutional adjudication the common-law approach to legal development.' "

First, this sentence is a recognition of at least some inconsistency or opposing dynamics in the terms *stability* and *flexibility* when considered as working legal concepts, judicial touchstones, or constitutional qualities and characteristics. The sentence, in or out of context, is reminiscent

of Pound's, admittedly paradoxical but perhaps more forthright, statement that the law must be stable, yet it cannot stand still. It suggests the philosophical problem posed in the statement by Alfred North Whitehead that "The art of progress is to preserve order amid change and to preserve change amid order," which could be applied or paraphrased to describe the nature of the judicial process, I think. Certainly, the Harlan comment about carrying over into constitutional adjudication the common-law approach to legal development seems to fall somewhat short of possible expectations. It does not analytically depreciate anything said in the majority opinion in the instant case; that is, if we are conscious of the real significance of the common-law approach and its methodology in the evolution and development of the law.[6]

In conclusion, I will go back to my original statement. Despite the dissent and other legal argumentation contrary to the majority, I have signed that opinion because, basically, in my judgment, it is sound, necessary and proper in terms of judicial thinking and action. I reiterate; I also think the problem presented by this appeal is *sui generis*.

DONWORTH, J. (dissenting)—I am unable to agree with the majority opinion for reasons stated below. Basically my disagreement is bottomed on the proposition that courts cannot supply omissions in legislation by reading into an act provisions which the legislature might have included therein but omitted. In this case, if the legislature had anticipated the possibility of a theft of the referendum petitions, it might have made some provision for dealing with the problem.

The opinion of those judges concurring in the result, as I read it, is in accord with my position, but agrees with the majority's result only because it holds that their decision is *sui generis* and should not be considered necessarily as a judicial precedent. I am in disagreement with that holding for reasons stated later.

---

[6]Llewellyn, Karl N. The Common Law Tradition. Boston. Little, Brown. 1960.

I heartily agree with the remarks of Mr. Justice Harlan (quoted in the concurring opinion), but believe that his ideas about the limitations of the judicial function apply to constitutional provisions as well as to statutes.[7] Therefore, in the latter portion of this dissent, I discuss the impact of the provision in Art. 2, § 1 (as amended) which states:

" . . . This section is self-executing, but legislation may be enacted especially to facilitate its operation. . . . "

The majority hold that, since the theft of the petitions made compliance by the Secretary of State with the con-

---

[7]Since the foregoing sentence was written, Mr. Justice Harlan has filed a dissenting opinion in the case of *Wesberry v. Sanders*, 376 U. S. 1, 11 L. Ed. (2d) 481, 84 S. Ct. 526 (decided February 17, 1964) in which the majority held that the present apportionment of members of the House of Representatives was violative of the United States Constitution. The concluding three paragraphs of Justice Harlan's dissent are, in my opinion, applicable to the problem now before this court. I quote them in full:

"Today's decision has portents for our society and the Court itself which should be recognized. This is not a case in which the Court vindicates the kind of individual rights that are assured by the Due Process Clause of the Fourteenth Amendment, whose 'vague contours,' *Rochin v. California,* 342 U. S. 165, 170, of course leave much room for constitutional developments necessitated by changing conditions in a dynamic society. Nor is this a case in which an emergent set of facts requires the Court to frame new principles to protect recognized constitutional rights. The claim for judicial relief in this case strikes at one of the fundamental doctrines of our system of government, the separation of powers. In upholding that claim, the Court attempts to effect reforms in a field which the Constitution, as plainly as can be, has committed exclusively to the political process.

"This Court, no less than all other branches of the Government, is bound by the Constitution. The Constitution does not confer on the Court blanket authority to step into every situation where the political branch may be thought to have fallen short. The stability of this institution ultimately depends not only upon its being alert to keep the other branches of government within constitutional bounds but equally upon recognition of the limitations on the Court's own functions in the constitutional system.

"What is done today saps the political process. The promise of judicial intervention in matters of this sort cannot but encourage popular inertia in efforts for political reform through the political process, with the inevitable result that the process is itself weakened. By yielding to the demand for a judicial remedy in this instance, the Court in my view does a disservice both to itself and to the broader values of our system of government."

stitutional and statutory provisions relating to the canvassing of the signatures on the referendum petitions impossible, this court can excuse the Secretary of State from compliance therewith and approve the issuance of his certificate of the measure (Referendum No. 34) placing it on the ballot at the next general election. This was done even though the affidavits filed on behalf of respondents conclusively prove that there was *no* canvass of the signatures on the petitions whatever.

In order to test the validity of the majority's conclusion, I think that the vital provisions of the constitution and applicable statutes (most of which are quoted in the majority opinion) should be pinpointed.

Amendment 7 to the state constitution providing for the second power reserved by the people (the referendum) contains this sentence:

". . . This section [Art. 2, § 1, subd. (d)] is self-executing, but legislation may be enacted especially to facilitate its operation. . . ."

Amendment 7 was adopted by the people in 1912, and the legislature, in 1913, in accordance with the above-quoted authorization, enacted what is now RCW chapter 29.79. Later the electorate, through the approval of an initiative measure, enacted the permanent registration act (RCW 29.07).

RCW 29.79.200 makes it the duty of the Secretary of State to forthwith canvass and count the names of the registered voters on initiative petitions filed with him.

RCW 29.79.220 makes it his duty, whenever a referendum or an initiative petition is filed with him, to canvass the names on the petition within 60 days, and states that "like proceedings shall and may be had thereon as provided in" RCW 29.79.200 and 29.79.210.

RCW 29.79.230 provides:

"If a referendum or initiative petition for submission of a measure to the people is found sufficient, the secretary of state shall . . . certify to each county auditor . . ." that it shall be voted upon by the people at the next general election.

The words "found sufficient" in the section last referred to must be construed in connection with the provisions in the permanent registration act (RCW 29.07.090 and .130), which read as follows:

"At the time of registering any voter, each registration officer shall require him to sign his name upon a third card upon which the registrar has entered his surname followed by his given name or names and the name of the county and city or town, with post office and street address, and the name or number of the precinct, in which the voter is registered." RCW 29.07.090.

"The third cards shall be kept on file in the office of the secretary of state in such manner as will be most convenient for, and for the sole purpose of, checking initiative and referendum petitions and mailing pamphlets required for constitutional amendments and by the initiative and referendum procedure. They shall not be open to public inspection or be used for any other purpose." RCW 29.07.130.

These two acts (RCW 29.79 and 29.07) are in pari materia and were enacted pursuant to Art. 2, § 1, subd. (d) of the constitution "to facilitate its operation."

In *State ex rel. Evich v. Superior Court,* 188 Wash. 19, 61 P. (2d) 143 (1936), we discussed the effect of the permanent registration act, saying:

"By the terms of § 13 of the permanent registration law adopted by the people at the November election in 1932 (chapter 1, Laws of 1933, p. 12, § 13), the voter, when registering with the local registration officer, is required to sign his name upon a card containing information necessary for his identification, and it is made the duty of the registrar of voters to transmit these cards to the secretary of state for filing in his office, together with a certificate that the cards so transmitted are the original cards filed by the voters whose names appear thereon, and that such voters are duly registered in the precincts and from the addresses shown. The cards provided for in this section

" ' . . . shall be kept on file in the office of the secretary of state, in such manner as will be most convenient for, and for the sole purpose of, checking initiative and referendum petitions and mailing pamphlets containing constitutional amendments and initiative and referendum measures and arguments for and against the same, and shall not be open to public inspection, or used for any other

purposes.' Rem. Rev. Stat. (Sup.), § 5114-13 [P. C. § 2321-23]."

The only way that the Secretary of State can determine whether a referendum petition contains the number of valid signatures of legal voters equal to 4 per centum of the number of voters registered and voting for the office of Governor at the last preceding regular gubernatorial election (as required by amendment 30) is to compare the signatures on the petition with those on the voters' registration cards on file in the secretary's office. Again, reference is made to the *Evich* case, where this court said, regarding the duties of the secretary:

"It will be noted, by reference to the certificate of the secretary of state, that he reported the number of signers from rural precincts that had been certified by the various registration officers, provision for such certification being then in force.

"Now, inquiring into the duty of the secretary of state under Rem. Rev. Stat. (Sup.), § 5411 [P. C. § 2764], we see that he is to 'proceed to canvass and count the names of legal voters . . . on such petition,' and if, at the conclusion of the canvass and count,

" ' . . . it shall appear that such petition bears the requisite number of names of legal voters, the secretary of state shall transmit a certified copy of such proposed measure to the legislature at the opening of its session together with a certificate of the facts relating to the filing of such petition and canvass thereof.'

"He is to ascertain the number of names of legal voters on the petition, and the standard manifestly is by comparison with the registration cards in his office certified to him by the local registration officers, in accordance with the provisions of § 13 of the permanent registration act, providing that these registration cards are deposited with him for the sole purpose of

" ' . . . checking initiative and referendum petitions, and mailing pamphlets containing constitutional amendments, initiative and referendum measures,' etc.

"That the secretary of state must compare the signatures on the petition, is further evidenced by Rem. Rev. Stat. (Sup.), § 5412 [P. C. § 2765], quoted above, requiring him to keep a record of all names appearing on the petition of persons not registered voters and report them to the prosecuting attorneys.

"It is obvious that the respondent's certificate to the legislature did not comply with the requirement of the statute, nor, for that matter, with the provision of the constitution, which, while embodying no specific method for the ascertainment of the fact, requires signatures of the requisite number of legal voters upon the petition. Indeed, the certificate negatives any suggestion of full compliance. . . . "

In the present case, the secretary counted only the total signatures from each county and added them together, which made a grand total of 82,955 signatures on the petitions, and advised the proponent by letter that canvass of the signatures would begin on July 1, 1963. (He also corrected 45 instances where a husband or wife had signed as Mr. and Mrs.) In his affidavit, the secretary stated that it was impossible for him to canvass the names on the petition forms because of the theft.

June 24, 1963, the theft of the petitions was discovered, and June 26, 1963, the Secretary of State certified the measure to the county auditors to be placed on the ballot for the state general election to be held November 3, 1964.

In so doing, the evidence showed that the secretary, in certifying the measure without a canvass of the signatures, took into consideration three factors:

(1) The inference that the 82,955 signatures on the petitions are valid is drawn from the fact that it is a criminal offense to sign such a petition with a false name or residence address, or when not a legal voter, or to sign more than one petition sheet.

In my opinion, if the secretary's execution of his certificate is to be based on this inference, there would be no need for the legislature to require a canvass at all. Without comparing the signatures on the petitions with the signatures on the voters' registration cards, the secretary could simply make his certificate based on the assumption that a substantial number of the signers would not violate the applicable statutes because of fear of criminal prosecution.[8]

[8]*State v. Patric,* 63 Wn. (2d) 821, 389 P. (2d) 292 (1963), is the only case that has come before this court which involved an appeal from a judgment and sentence based on an alleged violation of RCW 29.79.440-470.

Furthermore, the evidence shows that in one instance in the past 20.21 per cent of the signatures were rejected by the secretary for failure to comply with these statutes. Apparently, in that instance a substantial number of signers were not deterred from violating the law by the warning of criminal prosecution printed on the petitions.

(2) The second factor was the inference which the secretary deduced from his records in his office relating to previous referendum petitions. These show that the highest rejection rate was 20.21 per cent, but that, during the last 14 years, the average rejection rate has been 7.71 per cent of the signatures.

Using the vernacular, the secretary estimated, based on past experience, that "the chances were" that the present petitions contained sufficient valid signatures (48,630 were needed), because it was unlikely that in this case more than 41.37 per cent were invalid. Unless this percentage were exceeded, the petition would have been valid *if* this fact had been legally determined as the result of a canvass.

If such "guessing" were permissible, this might be a reasonable deduction, but, under the constitution and the statutes authorized thereby, the secretary's certificate cannot rest upon speculation, conjecture, or prognostications, but must be based on findings made by the secretary after a canvass of the signatures on the petitions.

(3) That no irregularities were discovered during the processing of the petitions is the last factor considered by the secretary. This fact is not surprising because the limited procedure which took place (as described above) would not disclose any irregularities except, for example, "Mr. and Mrs." signatures. The canvass was to begin on July 1 and, until that was completed, no one knew how many signatures would be found to be invalid.

The majority holds that the foregoing factors, when considered altogether, constituted sufficient evidence to justify the secretary, without canvassing the signatures on the petitions, to make his certificate which provides for the placement of referendum No. 34 on the ballot for the 1964 general election.

I disagree for the following reasons:

1. There admittedly has been a failure to comply with the mandatory legislation which the constitution authorized the legislature to enact "to facilitate" the operation of the Seventh Amendment (which amended Const. Art. 2, § 1). This amendment provided that this section is self-executing, but permitted legislation to be enacted especially to facilitate its operation.

Upon the adoption of the Seventh Amendment in 1912, and prior to the enactment of facilitating legislation, there was no prescribed manner in which any official was required to determine whether a particular referendum petition was signed by the required percentage of legal voters, as prescribed by that amendment.

This void was filled by the legislature a few months later, acting pursuant to the authorization contained in the amendment to enact facilitating legislation. This provision is contained in RCW chapter 29.79, which requires that the Secretary of State *shall* canvass the names on the petition and, *if found sufficient,* he shall certify, etc.

It seems plain to me, on the face of the record in this case, that the secretary has admittedly failed (through no fault on his part) to canvass the signatures on the petition prior to making his certificate.

The majority state that there was sufficient evidence before the secretary to justify his certifying the referendum for the ballot because of the three factors (described above) upon which he relied. None of these indicated in the slightest degree, except by speculation, whether the required number of the 48,630 signatures on the petitions before him were those of registered voters. The facilitating legislation prescribes the manner in which this vital fact shall be determined by the secretary—the only legal method is by comparison of signatures.

The majority state that there is a hiatus in the statute because it does not provide what shall be done if the petitions are stolen before being canvassed. This is true. Neither is it provided in the statute what should be done if petitions are destroyed by fire, by an earthquake (such as we had

in April, 1949), by the blast of an atomic bomb, or by other act of God or the public enemy. All the statute states in facilitating the constitutional provision reserving to the people the right of referendum is that *the signatures shall be canvassed before* the measure shall be certified for the ballot.

It is further stated by the majority that the people's right of referendum reserved by the constitution should be liberally construed so that this right may be facilitated and not hampered by technical statutes or technical construction thereof. My answer is that the constitution gave the legislature the authority to provide how this right might be facilitated and the legislature has done so by saying to the Secretary of State: "You canvass the voters' signatures on the petition before causing the measure to be placed on the ballot."

I see nothing technical about this procedure. In my opinion, the statute requires no construction (technical or otherwise). Its wording is free from ambiguity. It is the majority that is seeking to change the mandatory statute's clear meaning by permitting the substitution of guess work for precision. The fact that the legislature did not anticipate the theft of the petitions and provide a new procedure in such case does not, in my opinion, justify a court in supplying, or condoning the use of, a substitute method to fill in the hiatus.

The majority attempt to distinguish the *Evich* case (quoted above) because in that case the failure of the secretary to canvass the signatures was not made impossible by the act of a third party, while in the present case it was so made impossible and the legislature did not specifically provide any procedure to be followed in such event.

I do not agree that this is a valid distinction. Since the constitutional amendment and the mandatory statutes enacted to implement and facilitate its operation provided for canvassing the signatures in all cases without exception, neither the secretary nor the courts may read into the statutes what they think the legislature might have provided

if it had had the present situation in mind when it was legislating on this subject.

In my opinion, there is no basis for holding, in effect, that there is or can be substantial compliance with a mandatory provision of the constitution or of the statutes enacted to facilitate the operation thereof. Such provisions must be complied with fully.

The rule applicable here is well stated by the Supreme Court of North Carolina in *State v. Patterson*, 98 N. C. 660, 4 S. E. 350 (1887), as follows, at page 662:

"More particularly, for the present purpose, when the Constitution prescribes and directs in terms, or by necessary implication, that a particular power shall be exercised in a specified way, or a particular thing shall be done by a particular coordinate branch of government—as the Legislature—or by a particular officer or class of officers, and prescribes the way and manner of doing it—such direction cannot be disregarded—a due observance of it is essential, because the Constitution so provides, and its provisions are not in vain or of trifling moment. It is not of the nature of constitutions of government to provide non-essentials— useless unimportant details—such as may be disregarded and dispensed with. As we have said, they are organic— made upon solemn consideration by the sovereign authority, and contain general, essential provisions—details are avoided, unless deemed important—essential. Non-essential details are left to the discretion of those who exercise and administer the powers of government. If this were not so, why prescribe the way and manner? Why not leave these things to convenience and the authority charged with the exercise of the power? Why direct them? Why restrict them? And if such directions may be disregarded, ignored, suspended in some respects, then to what extent and in what respects? If one co-ordinate branch of the government, or one class of officers, may do so, why may not another, and all, as to duties devolved upon them respectively directly by the Constitution?

"The answer to these and like questions must be, that requirements of the Constitution shall prevail and be observed; and when it prescribes that a particular act or thing shall be done in a way and manner specified, such direction must be treated as a command, and an observance of it essential to the effectiveness of the act or thing to be done.

Such act cannot be complete—such thing is not effectual until done in the way and manner so prescribed."

It must be remembered that in this case the people themselves adopted the Seventh Amendment and thereby gave to the legislature the authority to facilitate its operation by legislation specially enacted. The legislature has done so in plain language. In my opinion, no court can, in effect, amend or nullify these statutory provisions solely because an unanticipated situation has arisen.

Finally, in the majority opinion it is stated, in effect, that, since the legislature failed to provide any guide as to the secretary's duties in a case where the petitions have been stolen, and since Amendment 7 sets forth no procedure for ascertaining whether the required percentage of registered voters have signed the petition, the court should consider the provision in Amendment 7, stating, "This section is self-executing . . ."

The majority then states:

"We have no doubt that the Secretary of State would consider it his duty to canvass the signatures in every case, even though no statute required it, but in this case he was called upon to make a decision without the benefit of the exact knowledge which a canvass would reveal. If the correctness of the decision which he made were in any doubt, or if there were a suggestion of fraud or mistake on the part of the proponents, we would hesitate to uphold that decision. But we think, in view of the fact that the evidence supporting the decision was undisputed and overwhelming, and there is no element of fraud or mistake involved, the intent and purpose of the framers of the constitution, in reserving the power of referendum, can be given effect only if his decision is sustained."

(How the evidence supporting the secretary's certificate can be described as undisputed and overwhelming when, as pointed out above, the mandatory provisions of the facilitating statutes were admittedly not complied with, I am unable to comprehend.)

The opinion of those judges who concur in the result of the majority expresses disagreement with the foregoing

quotation. Their concurrence in the result is based on the view that:

"The efficacy of Amendment 7 does not depend upon its implementation by the legislature. As the trial court said:

'The statutes are effective only insofar as they facilitate the action of the self-executing constitutional provisions.'

"The factual pattern of the instant case is bizarre and fantastic. We are in the same position this court would have been in had the legislature refused to pass implementing legislation."

This statement raises the important question of the proper interpretation of the self-executing clause in the constitution as applied to the facts of this case.

For purposes of discussion of the constitutional question thus raised, I will assume that there is no legislation which is applicable to the problem before us.

I can find nothing in the words "This section is self-executing" which justifies ignoring the remainder of the constitutional provisions whereby the people reserved to themselves the power of referendum.

Perhaps a review of the constitutional history on this subject may be helpful. From 1889, when the constitution was adopted, until 1912, the legislative authority of the state of Washington was vested exclusively in the legislature.

In 1912, Amendment 7 was adopted. This amendment continued the legislative authority in the legislature, but added the provision:

". . . but the people reserve to themselves the power to propose bills, . . . [this refers to the power of initiative with which we are not here concerned] and also reserve power, at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature."

The question then arises, how, in the absence of applicable legislation, do the people go about exercising this reserved power of referendum? The answer is provided in Amendment 7, wherein it is said "either by petition signed by the

required percentage of the legal voters" or by the legislature.

The question then is: What is the percentage of legal voters who must sign a petition before the people may exercise the reserved power of referendum with respect to any act of the legislature? In 1912, the answer was:

"Six per centum, but in no case more than thirty thousand, of the legal voters shall be required to sign and make a valid referendum petition."

In 1956, the required number was changed as follows:

"Hereafter, the number of valid signatures of legal voters required upon a petition for an initiative measure shall be equal to eight per centum of the number of voters registered and voting for the office of governor at the last preceding regular gubernatorial election. *Hereafter, the number of valid signatures of legal voters required upon a petition for a referendum of an act of the legislature or any part thereof, shall be equal to four per centum of the number of voters registered and voting for the office of governor at the last preceding regular gubernatorial election.* These provisions supersede the requirements specified in section 1 of this article as amended by the seventh amendment to the Constitution of this state." (Amendment 30) (Italics mine.)

Thus the specific conditions required by the constitution which must be complied with before the people may exercise the reserved power of referendum may be summarized as follows:

A petition must be signed by *legal* voters equal in number to 4 per cent of the registered voters in the state who voted for the office of governor at the last preceding election. In the present case, the required number of legal voters is 48,630.

The problem then is: In the assumed absence of any legislation, how is this vital question determined? The self-executing provision in Amendment 7 does not specify who shall determine this vital question of fact, but the permanent voters' registration act (RCW 29.07.130), enacted in 1933, provides a method of ascertaining whether the petition contains the requisite number of valid signatures of legal

voters. In the absence of a constitutional designation of a state officer to perform this vital duty, this vital factual issue could be determined by a court of competent jurisdiction. In any event, the underscored portion of Amendment 30 (quoted above) cannot be completely ignored, as has been done in this case.

It seems clear to me that the words in the constitution stating that "This section is self-executing" do not mean that the signatures on a referendum petition are self-canvassing. The opinions of the majority and of the judges concurring in the result do not take notice of the vital constitutional limitation which the people themselves placed in the Seventh Amendment as a condition precedent to the exercise of the reserved power of referendum, to wit, that the petition must contain "the number of *valid* signatures of *legal* voters" (italics mine) equal to 4 per centum of the number of registered voters who voted for the office of governor at the last preceding election.

Without this vital fact being determined (*i.e.* whether the petition contains at least 48,630 valid signatures of legal voters), the whole proceeding is void. Since the people in their amendment to the constitution have said that the reserved power of referendum may be exercised *only* upon this express condition, and, since this condition has not been complied with in the present case, there can be no submission of Laws of 1963, chapter 37 (Referendum Measure No. 34) to a vote of the people.

It is stated that the will of the people should not be thwarted by the act of a felon, but I regard it a much more serious thing for a court to waive compliance with a mandatory[9] constitutional condition precedent to the exercise of the reserved power of referendum.

If the procedure followed in this case is approved, it means that, hereafter, whenever petitions are lost, destroyed, or stolen under any circumstances, any proponent who has filed a referendum petition signed by the *requisite number* of persons (whether or not it contains the *valid*

---

[9]All provisions of our state constitution are mandatory unless by express words they are declared to be otherwise. Art. 1, § 29.

signatures of the required number of *legal* voters) can cause the referendum measure involved to be submitted to the voters at the next election without a single signature thereon having been compared with those on the registration books. Speculation can be substituted for certainty, and the requirement for canvassing the signatures on the petition can be ignored entirely. As I see it, if these statutory and/or constitutional safeguards are to be ignored, there is as much danger that a petition having *less* than the requisite number of valid signatures of legal voters will in the future be submitted to the electorate as that valid petitions will fail to attain their objective.

The constitution means the same thing regardless of hardship, inconvenience, or even impossibility of compliance with it, and no court can excuse noncompliance with its mandatory provisions.

In *State ex rel. Lemon v. Langlie*, 45 Wn. (2d) 82, 273 P. (2d) 464 (1954), we quoted with approval the following statement from 11 Am. Jur. 651, Constitutional Law, § 44, regarding the function of a state constitution:

" 'A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. No function of government can be discharged in disregard of, or in opposition to, the fundamental law. The state Constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates; and the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of such Constitution.' " (p. 109)

With regard to the statement in the majority opinion that the court cannot assume that a theft of the petitions will ever occur again, I think that the court should not be led into upholding a violation of either the applicable statutory or the constitutional provisions on that assumption. In the *Lemon* case, *supra*, we quoted from *State ex rel.*

*Banker v. Clausen*, 142 Wash. 450, 253 Pac. 805 (1927), in which we quoted the following statement from 6 R.C.L. 46:

" ' "A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, *even though the circumstances may have so changed as to make a different rule seem desirable.* In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. *Furthermore, constitutions do not change with the varying tides of public opinion and desire.* The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders." ' (Italics ours.)"

For the reasons stated, I would reverse the judgment of the trial court with directions to dismiss the summary judgment entered in favor of respondent and to grant petitioner's motion for summary judgment and accord him the relief prayed for in his complaint.

May 27, 1964. Petition for rehearing denied.