Secretary of State of Wyoming, Thyra THOMSON, Appellant (Respondent),

v.

WYOMING IN–STREAM FLOW COMMITTEE and its sponsors, Dr. Charles Walter, Dr. Charles Stebner, and Bruce E. Collins, Appellees (Petitioners).

WYOMING IN–STREAM FLOW COMMITTEE and its sponsors, Dr. Charles Walter, Dr. Charles Stebner, and Bruce E. Collins, Appellants (Petitioners),

v.

Secretary of State of Wyoming, Thyra THOMSON, Appellee (Respondent).

Nos. 5750, 5750A.

Supreme Court of Wyoming.

Sept. 22, 1982.

Don W. Riske of Riske &. Edmonds, P. C., Cheyenne, for amicus curiae, League of Women Voters of Wyoming, in support of the position of appellee.

John A. Sundahl and George E. Powers, Jr. of Godfrey & Sundahl, Cheyenne, for amici curiae, Wyoming Farm Bureau Federation, Wyoming Wool Growers Ass'n and the Wyoming Stock Growers Ass'n, in support of the position of appellant.

Steven F. Freudenthal, Atty. Gen., argued, Bruce A. Salzburg, Senior Asst. Atty. Gen. and Rowena L. Heckert, Asst. Atty. Gen., for appellant.

E. Michael Weber of Lonabaugh & Riggs, Sheridan, argued, for appellees.

Before ROSE, C. J., RAPER, THOMAS and ROONEY, JJ., and GUTHRIE, J., Retired.

RAPER, THOMAS and ROONEY, Justices, and GUTHRIE, Justice, Retired.

This appeal involves the role of the Secretary of State, appellant (Secretary), in the performance of her duties relating to initiative and referendum pursuant to Art. 3, § 52, Wyoming Constitution implemented by § 22–24–101, et seq., W.S.1977. Appellees (Committee) went through the preliminary procedures for initiating a proposed law for referral to the people by ballot at a statewide election. Petitions on Secretary-approved forms were circulated statewide. Upon submission of the petitions by the Committee to the Secretary containing some 30,822 signatures, she determined, through a review process, it lacked a sufficient number of signatures of qualified registered voters, was therefore improperly filed, and the proposed law could not be submitted to the electors at the 1982 general election.

The Committee was aggrieved by the determination and pursuant to § 22–24–122, W.S.1977, brought an action in the Laramie County District Court for review. The district judge reversed the decision of the Secretary and remanded the matter to her for preparation of a ballot proposition for the 1982 general election ballot, for the ultimate reason that the Secretary, as only a ministerial administrative officer, has no authority to challenge signatures or to inquire into the validity or the qualifications of the persons signing, and the petitions should have been presumed valid. On appeal, the Secretary presents the issue of whether that legal conclusion of the district judge is correct.

The other issues which we must consider are raised by the Committee in its cross appeal:

2. Is the Wyoming Initiative and Referendum Statute unconstitutional to the extent it requires signatures to be of qualified registered voters, rather than merely qualified voters?

3. The Secretary failed to follow the Administrative Procedure Act in adopting procedures for the handling and control of the initiative petitions and in making determinations of general applicability to initiative petitions.

4. Even assuming the Secretary had either the authority or obligation to conduct a verification procedure, the procedure adopted by the Secretary was arbitrary, capricious and characterized by an abuse of discretion.

5. The Secretary's decision was arbitrary, capricious, and characterized by an abuse of discretion or otherwise unlawful

for failure to explain how she arrived at her facts and conclusions.

Because of an interplay between the issues, they are not sharply divided in our discussion.

The subject matter of the proposed instream flow law is immaterial to our consideration and decision.[1]

We will reverse the district court and reinstate the Secretary's determination.

Article 3, § 52, Wyoming Constitution with respect to initiative and referendum provides in pertinent part:

"(a) The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum.

"(b) An initiative or referendum is proposed by an application containing the bill to be initiated or the act to be referred. The application shall be signed by not less than one hundred (100) qualified voters as sponsors, and shall be filed with the secretary of state. If he finds it in proper form he shall so certify. Denial of certification shall be subject to judicial review.

"(c) After certification of the application, a petition containing a summary of the subject matter shall be prepared by the secretary of state for circulation by the sponsors. If signed by qualified voters, equal in number to fifteen per cent (15%) of those who voted in the preceding general election and resident in at least two-thirds (⅔) of the counties of the state, if [it] may be filed with the secretary of state.

"(d) An initiative petition may be filed at any time except that one may not be filed for a measure substantially the same as that defeated by an initiative election within the preceding (5) years. The sec-

retary of state shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty (120) days after adjournment of the legislative session following the filing. If, before the election, substantially the same measure has been enacted, the petition is void.

* * * * * *

"(f) * * * Additional procedures for the initiative and referendum may be prescribed by law."

The constitutional provisions have been implemented as authorized by § 52(f), supra, by additional procedures through § 22–24–101, et seq., W.S.1977, which read in pertinent part:

Section 22–24–114:

"(a) Before petition is filed, it shall be verified by the sponsor who personally circulated it. The verification shall be in affidavit form and shall state in substance that:

"(i) The person signing the affidavit is a sponsor and is the only circulator of that petition;

"(ii) The signatures on the petition were made in his presence; and

"(iii) To the best of his knowledge, such signatures are those of the persons whose names they purport to be. In determining the sufficiency of the petition, the secretary of state shall not count signatures on petitions not properly verified."

Section 22–24–115:

"The sponsors may file petitions with the secretary of state if signed by qualified registered voters equal in number to fifteen percent (15%) of those who voted in the preceding general election and resident in at least two-thirds of the counties

---

1. As a matter of interest, however, the approved summary of the proposed law as it appeared on the petitions circulated for signature described it:

"This bill proposes to create new statutes authorizing the Game and Fish Commission to acquire water rights in Wyoming streams by purchase, lease, agreement, gift or devise and to appropriate unappropriated water for

in-stream flows to protect fish and wildlife, livestock watering, aquatic habitat, asthetic beauty, recreation, sub-irrigation, riparian habitat and water quality. Said act will not grant the Commission condemnation of existing water rights. The preservation of in-stream flows of water is declared to be a beneficial use."

of the state. The sponsor of a petition for referendum may file the same only within ninety (90) days after the adjournment of the legislative session at which the act was passed. The ninety (90) day limitation shall not apply with reference to an act passed previous to January 1, 1973, if the application is filed prior to June 10, 1973."

Section 22–24–116:

"(a) Within not more than sixty (60) days of the date the petition is filed, the secretary of state shall review it and shall notify the committee whether the petition was properly or improperly filed. The petition shall be determined to be improperly filed if:

"(i) There is an insufficient number of signatures of qualified registered voters;

"(ii) The subscribers were not resident in at least two-thirds of the counties of the state; or

"(iii) The petition is for referendum and was not filed within ninety (90) days after the adjournment of the legislative session at which the act was passed. The ninety (90) day limitation shall not apply with reference to an act passed previous to January 1, 1973, if the application is filed prior to June 10, 1973."

Within these constitutional and statutory provisions we see key expressions and words which will unlock the answer to the issues before us. The petition to place the proposed law on the ballot may only be filed with the Secretary "[i]f signed by qualified voters, equal in number to fifteen per cent (15%) of those who voted in the preceding general election and resident in at least two-thirds (⅔) of the counties of the state * * *," Art. 3, § 52(c), Wyoming Constitution, supra; the legislature requires that the petitions be signed by "qualified registered voters," § 22–24–115, W.S.1977, supra. The legislature, as authorized, prescribed by law the additional procedure that within sixty days of the date the petition is filed in the office of the Secretary, the Secretary "shall review it and shall notify the committee whether the petition was properly or improperly filed." While the

constitution provides it shall not be filed unless it has the requisite signatures, we construe the legislative version to mean that the petition is initially deposited with the Secretary in order that it may be reviewed for adequacy to determine whether there are the required number of signatures from two-thirds of the state's counties and the subscribers are qualified registered voters. If properly filed, the proposition may then be placed on the ballot; if not adequate, it will be considered improperly filed and the proposition will not be placed on the ballot. Section 22–24–116, W.S.1977, supra.

The language of the constitution and the language of a statute are construed similarly. In determining the meaning of words within a constitutional provision, this court must consider the probable intention of the framers of the constitution in adopting the constitutional provision. *Witzenburger v. State ex rel. Wyoming Community Development Authority,* Wyo., 575 P.2d 1100 (1978). In the instance before us, the constitutional provision was framed by the Wyoming State Legislature. Original Senate Joint Resolution No. 3, Session Laws of Wyoming, 1967, pp. 729–730. In construing constitutional provisions, the fundamental purpose is to give effect to their purpose and intent; courts will not ignore the general spirit of the instrument.

Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory construction; the court has no right to look for and impose another meaning. *Board of County Commissioners of County of Campbell v. Ridenour,* Wyo., 623 P.2d 1174, reh. denied 627 P.2d 163 (1981). It is our duty to ascertain and give full force and effect to the legislative product. *Yeik v. Department of Revenue and Taxation,* Wyo., 595 P.2d 965 (1979).

The procedures prescribed by Art. 3, § 52, Wyoming Constitution, supra, preliminary to actual circulation of the Petition for Adoption by Initiative of a Bill for the Protection of Minimum In-Stream Flows

were followed. The Secretary certified the application made by 100 qualified voters as sponsors and prepared the form in 500 copies delivered October 30, 1980 to be used by the sponsors in gathering together the required signatures—"fifteen percent (15%) of those who voted in the preceding general election and resident in at least two-thirds of the counties of the state."

The application to proceed with the initiative process was made October 14, 1980 and approved October 20, 1980. At that time, on the basis of the 1978 general election, the number of signatures required would have been 21,345. However, by the time the sponsors made their final submission of the accumulated petitions on December 11, 1981 (some had been delivered in earlier months), the last general election had been held in November 1980, so the number of qualified voter signatures required had increased to 27,154. The petitions contained 30,822 signatures.

The Secretary started her review after December 11, 1981 with a full-time staff of seven to eight workers at a cost of $7,000. Initially a random sampling indicated a 70% validity rate. Later, a second sampling indicated an 83% validity rate. This indicated a too-close-to-call situation so a one-to-one check of all 30,822 signatures became necessary. This involved a comparison of signatures on the petitions with the lists of registered voters from all 23 counties. Because considered impractical, the Secretary did not maintain a consolidated statewide list of registered voters but did have a list of all registered voters by county. A consolidated statewide list may not permit the Secretary to determine that the constitutional and statutory requirements that signers be resident in at least two-thirds of the counties are satisfied. The in-stream flow petitions were intended for circulation by county, but in some instances were carried around to various counties, so in these instances cross checking was required. Some signatures were illegible. In other instances students at the University of Wyoming signed Albany County registrations but were registered in home counties; in some cases others had moved from their counties of registration.

When indicated, cross checking was required. Some signatories had signed twice, including one of the sponsors (there were 830 duplicate signatures).

Signatures were accepted by the Secretary when they were identified, by address or otherwise, with names on the list of registered voters even though initials were in lieu of first names, or vice versa, even though nicknames were used, even though married names were used (Mrs. John Doe verses Mary Doe), etc. The sponsors were permitted to examine the records of those declared invalid. Through their efforts, some 88 signatures were restored as valid.

At the conclusion of the review, the Secretary gave notice of her determination to the sponsors:

"In accordance with W.S. 22–24–116(a), this office has completed the verification of the In-Stream Flow Initiative Petition and has determined that the petition lacks a sufficient number of signatures of registered voters to satisfy the requirements of the Wyoming Constitution and therefore cannot be submitted to the voters at the 1982 General Election.

"A summary of the final tabluations [sic] follows:

"Total signatures submitted: 30,822

"Signatures of registered voters required by law: 27,154

"Verification of signatures submitted showed: 25,888 valid & 4,934 invalid

"1. Using the current Master Voter Registration List, we found 25,327 valid signatures and 5,495 invalid signatures.

"2. To determine whether signers might have been registered 'at the apparent time' they signed the petition, we rechecked invalid signatures against the statewide 1980 General Election Registry of Voters, and 561 additional valid signatures were added, making a grand total of 25,888 valid signatures and 4,934 invalid signatures.

"Additionally, we call to your attention another failure to meet the law which appears now to be moot since the petition did not contain sufficient signatures of

registered voters to achieve ballot position. We found that the names and addresses of 11 sponsors circulating and attesting petitions were not submitted to this office as required by W.S. 22–24–107. "In closing, I wish to commend you and the committee for your tremendous effort in completing the first initiative drive of nine undertaken since 1968."

It is from this notice that this action was taken to the district court by the Committee, pursuant to § 22–24–122, W.S.1977:

"Any person aggrieved by any determination made by the secretary of state or by the attorney general may bring an action in the district court of Laramie county to have the determination reviewed by filing application within thirty (30) days of the date on which notice of the determination was given."

Other facts necessary for this opinion will be set out as required.

As to the issue raised by the Secretary in this appeal, the Committee and the trial judge rely on a general statement set out in 42 Am.Jur.2d Initiative and Referendum § 54:

"If the question of the validity of the petition is properly raised, a court may take evidence on the question.

"There is a presumption that petitions that have been circulated, signed, and filed are valid, and the burden of proof to show their invalidity rests upon those protesting against them.

"In the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, the names on a petition properly verified are presumed to be genuine. This presumption has been said to arise from the required verification of the signatures under oath and from the criminal sanctions on placing an improper signature on such a petition.

"Because of the presumed validity of signatures on a verified petition, an administrative officer has no authority to challenge signatures, but must file a properly verified petition and leave to the court the determination of fraud, forgery, and illegality. [Underlining added by trial judge.]

"The presumption places on those who seek to invalidate signatures on a petition the burden of producing evidence sufficient to overcome the presumption. In the absence of such evidence, the presumption must prevail. The presumption has been held to balance a presumption arising from an identity of names so that one contesting the validity of the petition on the ground that it had been signed twice by certain electors has the burden of offering some evidence to support his claim; in the absence of such evidence, the petition will be regarded as valid." (Footnotes omitted.) [2]

The trial judge was apparently persuaded by this expression.

However, examination of the footnote to that paragraph containing underlining by the trial judge reveals a 1914 case, *State ex rel. Kemper v. Carter*, 257 Mo. 52, 165 S.W. 773, one of those relied on by the Committee in its brief, where entirely different constitutional and statutory provisions were involved. As said by that court:

" * * * From this it is reasonably plain that our statute means what it says, and that, 'when any such referendum petition' (i.e., a referendum petition signed by 5 per cent. of the voters in at least two-thirds of the congressional districts, and who purport, from the verifications aforesaid [section 6749], to be legal voters of the state and of such congressional districts) 'shall be offered for filing,' the Secretary of State shall file the same; he has no discretion in the matter. If he refuse to file such petition, he may be compelled by mandamus to do so. * * *

"We are not saying that the Secretary of State must file a referendum petition upon which either there is not enough

2. We have examined all the cases cited in the footnotes to this Am.Jur. quote; and, as did the trial judge, we find that they represent different constitutional provisions and statutes applied in different circumstances than what we now have before us. We discuss only *State ex rel. Kemper v. Carter,* infra.

congressional districts represented by the signers thereon, or not enough signers from such or any of such districts. But, where prima facie all of these facts appear, he must file the petition as presented to him, and leave to the courts the determination of questions of latent fraud, forgery, and hermetic illegality, for which determination our statutes, it would seem, have provided full and ample machinery for every condition and contingency, and for the protection and safeguarding of both protagonists and antagonists of the act sought to be referred. Clearly the warning provided for by statute, which recites that a breach of the law as to a referendum petition constitutes a felony, and the careful provisions for verification of the stated facts as to residence, names, and qualifications of signers, indicate that these provisions were deemed such adequate safeguards against fraud and forgery as that compliance therewith, showing prima facie sufficiency and regularity, was intended to import such sufficient verity to the Secretary of State as to make it his duty to file petitions bearing such legal indicia when such were presented to him for filing. " * * * [I]n addition to the other reasons we suggest, there is no specific statute requiring the Secretary of State, after he shall have filed the petition, to perform any other duty (so far as the controversy here goes) at any fixed time, except that he must 'forthwith transmit to the Attorney General a copy thereof (i.e., of the measure to be submitted to a vote), and within ten days thereafter the Attorney General shall provide and return to the Secretary of State a ballot title for said measure.' * * * " (Emphasis added.) 165 S.W. at 780–781.

■ It appears, then, that there was no requirement in Missouri for the Secretary

of State or any other official to conduct a review to determine whether the petitions were signed by an adequate number of qualified registered voters. It also is made plain that the Missouri verification is positive as to "the qualifications of the signers." The Wyoming form of verification does not verify that the signers are "qualified registered voters" but only that "[t]o the best of his [sponsor's] knowledge, such signatures are those of the persons whose names they purport to be." Section 22–24–114, supra. This is useless for the purpose urged by the Committee; it does not reach to any assurance that the signers are registered voters. This is not a safeguard sufficient to create a presumption. In passing, it is noted that since the time frame of *State ex rel. Kemper v. Carter,* supra, there has been a reform of the initiative and referendum procedures in that state. It now requires processing of petitions by the secretary of state. Additionally, it has been held there that "legal voters" must be registered voters. *Scott v. Kirkpatrick,* Mo., 513 S.W.2d 442 (1974).

■ We have statutes which require the Secretary to do much more than just count the signatures, depend on the verifications[3] and, if the required number of signatures are present, proceed to arrange placement on the ballot, then wait to be sued on claims of forgery, fraud, etc. The Secretary in Wyoming has the duty to review and not only count but determine whether there is an "insufficient number of signatures *of qualified registered* voters." (Emphasis added.) Section 22–24–116(a)(i), supra. We will later discuss the difference in the wording of this statute and Art. 3, § 52(c), Wyoming Constitution.

We consider and hold that the specific statutory review requirements placed on the Secretary show an intent on the part of the legislature that those seeking to exer-

---

**3.** The warning required under Wyoming law: Section 22–24–111, W.S.1977:

"Each petition shall include a statement of warning that a person who signs a name other than his own on the petition, or who knowlingly [sic] signs his name more than once for the same proposition at one (1) election, or who signs the petition knowing that he is not a qualified registered voter, upon conviction, is punishable by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one (1) year or both."

cise the right of initiative in this state must, as a condition precedent, comply with the conditions prescribed. *Tyler v. Secretary of State,* 229 Md. 397, 184 A.2d 101 (1962). See also, *Barnes v. State ex rel. Pinkney,* 236 Md. 564, 204 A.2d 787 (1964).

The Committee cites *State ex rel. Benham v. Cheever,* 71 Wyo. 303, 257 P.2d 337 (1953) as standing for the proposition that the presumption of validity of signatures on petitions which have been circulated and filed by a sponsor verifying under oath that those signing are qualified electors, is well recognized, which indeed it does. However, in that case the Wyoming statutes, providing for initiating an election to determine whether the manager form of government should be adopted by a city, contained no provision requiring the city clerk to determine whether it was signed by a sufficient number of qualified electors. This court made a particular point of directing attention to the absence of that feature of the law, now clearly appearing in the initiative provision with which we are concerned. The court went on to hold that if the city authorities questioned the petitions as not being what they purported to be, the burden fell on them to present evidence questioning the validity and correctness of the petitions, which they did not do; they cannot "defend it by mere inertia." See also *State ex rel. Keefe v. McInerney,* 63 Wyo. 280, 182 P.2d 28 (1947) where the statute with respect to establishing the city manager form of government provided:

> "Within five (5) days after filing with the city clerk of a city, of a petition of *electors* of said city equal in number to ten (10) percentum of the number of registered electors of such city, the mayor thereof shall by a proclamation * * *."

This court there held that electors did not need to be registered, but it is sufficient that they be otherwise qualified. It must be pointed out that the statutes with respect to statewide initiative and referendum require otherwise and have become more specific and strict. The word "voters" rather than the word "electors," was used by the Wyoming legislature with a purpose. We consider neither *State ex rel. Benham v.* *Cheever* nor *State ex rel. Keefe v. McInerney,* supra, in point.

Insofar as they are pertinent to the issues before us, the Secretary performed her tasks in accordance with the dictates of the constitution and statutes. For the purpose of such issues, it is immaterial whether such tasks were ministerial or discretionary.

▇ If ministerial, she performed the tasks of counting signatures and comparing them with voter registration lists in an organized and objective fashion. The action is similar to that of counting signatures and comparing signatures on the petitions with the voter registration list of signatures, no different than counting and recording votes, placing a paper in the right file folder, stamping a document as recorded, entering a case in a docket book, or typing a letter. A signer was either a registered voter or not a registered voter. If it was impossible to decipher a signature, it was a nullity. *Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton,* Okl., 501 P.2d 1089 (1972); *Whitman v. Moore,* 59 Ariz. 211, 125 P.2d 445 (1942). Reason tells us that an illegible name is the same as a blank line, not entitled to recognition and counting. It is impossible to even create a presumption if it is impossible to identify that to which the presumption is to apply. Nor should the same signer be counted twice. *People ex rel. Wright v. Kelly,* 294 Mich. 503, 293 N.W. 865 (1940). Duplicate signatures represent only one registered voter, if indeed registered. The position of the Committee that her position was adversary to its position is not reflected from the record.

▇ If the Secretary's tasks were discretionary, she and her staff went out of their way to exercise the discretion in favor of the Committee. Signatures were validated although they were not signed in the same fashion as they appeared on the registration lists. Five petitions were filed without validation by notarization as required by § 22–24–114, supra. The Secretary permitted the director of the Committee to get them notarized and returned after the

deadline. The Secretary advised the director that some eleven petitions did not reveal that they were circulated by sponsors as required by § 22–24–114. With the help of the director, they found five had in fact been circulated properly. The Secretary allowed nicknames instead of registered names and initials instead of registered full names. Where printed names did not appear, the Secretary had to depend on legibility of names subscribed; this she did. The Committee was permitted to examine the tabulations; some names were restored as a result. The final notice of the Secretary's determination shows that the names and addresses of some eleven sponsors circulating petitions had not been submitted to the Secretary as required by § 22–24–107. They were, therefore, not sponsors; petitions can only be circulated and verified by sponsors. Sections 22–24–112 and 22–24–114, supra.

As noted, we need not concern ourselves with the propriety of the Secretary's actions in these respects, but it could well be that she went too far in her efforts to validate questionable signatures. For example, the verification affidavit required by § 22–24–114 requires that the signer swear that the circulator is a sponsor. If not in fact a sponsor, the affidavit is false. In *Lundberg v. Koontz*, 82 Nev. 360, 418 P.2d 808 (1966), the court held that the signatures on petitions falsely verified could not be counted. Section 22–24–114(a)(iii) clearly declares that "[i]n determining the sufficiency of the petition, the secretary of state shall not count signatures on petitions not properly verified." Yet, the Secretary counted them. If the Secretary used discretion in actions taken in this case, it was certainly not abused to the detriment of the Committee.

To assume that a signatory is a registered voter is in complete discord with not only the constitution but the statutes as well. The Secretary was by statute clearly directed by § 22–24–116 to determine whether there was a sufficient number of qualified registered voters. The Secretary had no authority to presume persons were registered to vote and to ignore the statutory directive. Every word, clause and sentence must be given meaning; a statute must be construed so that no part is inoperative or superfluous. *State Board of Equalization v. Cheyenne Newspapers, Inc.*, Wyo., 611 P.2d 805 (1980).

We are unconvinced that the warning to signers and verification by the sponsors is intended to neutralize the requirement that the Secretary shall determine whether "[t]here is an insufficient number of signatures of qualified registered voters." We cannot construe a statute in such a fashion that one section will destroy another. *DeHerrera v. Herrera*, Wyo., 565 P.2d 479 (1977). Furthermore, § 22–24–116 is couched in the mandatory language of "shall." Mandatory statutes must be obeyed, and courts have no right to make law contrary to that prescribed by the legislature. *In re Hartt's Estate*, 75 Wyo. 305, 295 P.2d 985 (1956). The Secretary was not authorized to presume anything.

Section 22–24–117, et seq., W.S. 1977, sets forth a procedure for placing an initiative question on the ballot "[i]f the petition is properly filed." Section 22–24–116, W.S.1977, supra, sets forth three conditions to be satisfied for a proper filing, one of which is that the signatures on the petitions be those of "qualified registered voters." The Secretary is given the duty to "determine" whether or not the conditions are satisfied. If there exists a presumption that all signatures on the petition are those of qualified registered voters, of what purpose is the legislative requirement that the Secretary make a determination in this respect? The legislature will not be presumed to intend futile things. *Yeik v. Department of Revenue and Taxation*, supra 595 P.2d 965; *DeHerrera v. Herrera*, supra.

Inasmuch as the verification by the sponsors is silent as to the voter status of the signer and relatively innocuous with respect to his or her identity, the verification cannot justify a presumption of validity. If the existence of criminal sanctions is to be relied upon to effect a presumption of validity, the fact that some 4,000 people

signed this petition, when they should not have, reflects the weakness of such reliance. Furthermore, our statute, § 22–24–123 [4] does not provide a felony sanction as in cases relied upon by the Committee. Under the circumstances, an attempt to apply a presumption of validity would be incongruous.

Those seeking to have the initiative question upon the ballot must present petitions with appropriate signatures. If the Secretary refuses to accept the petition as proper, their recourse is to bring an action in the district court in which they would have the same burden, i.e., persuading the district court that the petition contained the required number of appropriate signatures. Conversely, if the Secretary accepted the petition as proper, the recourse of those opposing the petition is to bring an action in the district court where they would have the burden of persuading the court that the petition did not contain the required number of appropriate signatures. Given the language of the statute, it does not appear that either a proponent or an opponent of an initiative measure requires or is entitled to the assistance of a presumption. Any presumption of validity is dissipated when it is found that a signer is not a registered voter.

The Committee has made no showing that the count taken by the Secretary was inaccurate to the extent that there were the requisite number of signatures of registered voters to authorize placing the proposed measure on a ballot at the 1982 general election, nor did it make any offer of proof to the district court that their petitions contained the requisite number of signatures of registered voters. If it is the position of the Committee that only courts can decide the adequacy of initiative petitions, then it should have undertaken the burden of establishing the inadequacy of the Secre-

tary's count by showing there were the required number of registered voters signatory to the petitions. Since it was the appellant from the decision, it did have the burden on appeal to prove error by the Secretary. This is the rule in any review matter. *Beck v. Givens,* 77 Wyo. 176, 191, 313 P.2d 977 (1957); *Wyoming Bancorporation v. Bonham,* Wyo., 527 P.2d 432 (1974), supplementing 563 P.2d 1382 (1977), reh. denied 566 P.2d 219.

The evidence presented by the Secretary explained all that was done in the Secretary's office. The evidence of the Committee only pointed to where there *could* be some error to the extent of a few hundred signatures, but it would certainly not develop the shortage by the almost 1,300 necessary (27,154—25,888 = 1,266) plus those on petitions with invalid verifications. The Committee presented no names which should be added as valid. A few letters appear in the court file from persons who wanted names added.

The Committee was fully aware that signers must be registered voters. It put out its own instructions to its sponsors (signature solicitors). Amongst them were:

"PLEASE FOLLOW THESE STEP BY STEP INSTRUCTIONS TO INSURE THAT EACH SIGNATURE OBTAINED IS VALID.

"1. *ASK IMMEDIATELY, if the person is a registered voter. If they don't know or aren't sure, do not have them sign the petition.* ·

"2. If the person is a registered voter, explain briefly what the petition drive is for (to have an instream flows bill placed on the 1982 ballot) and/or refer them to attached summaries of the bill and to the bill itself.

"(A very good summary you can say verbally is as follows: It is a bill to help

---

4. Section 22–24–123, W.S.1977 provides:

"Any person who signs a name other than his own on a petition for initiative or on a petition for referendum, or who knowingly signs his name more than once for the same proposition at one (1) election, or who signs such petition knowing that he is not a quali-

fied registered voter, or who makes a false affidavit or verification on such petition, upon conviction shall be fined not more than one thousand dollars ($1,000.00) or imprisoned for not more than one (1) year, or both."

protect stream water in Wyoming for fish and wildlife habitat *without* taking water away from anybody who already has claim to it.)

"3. EXPLAIN TO THE SIGNER that signing this petition DOES NOT necessarily mean they are FOR the bill, ONLY that they want the opportunity to vote on the issue during the 1982 general election.

"4. If the person agrees to sign the petition, request that he/she sign his/her legal name, for example: William Earl Smith instead of Bill Smith. *This should be the name they signed when they registered to vote.*

"5. *Request that the person SIGN and PRINT his/her name LEGIBLY.* (This is very important for the persons checking signatures at the Secretary of State's Office).

"6. *Request that the person indicates his/her address he/she had WHEN THEY LAST REGISTERED TO VOTE.* (This is the address the Secretary of State or County Clerk will have on the records).

 \* \* \* \* \* \*

"If you don't meet this deadline, please send the petition as soon as possible. *The Secretary of State only has so long to certify signatures.* After you have done all these things, sit back and feel good inside because you have done something to help protect Wyoming's streams." (Capitalized words in original. Emphasis added.)

It now seems inconsistent that the Committee should claim that the Secretary has no authority other than to count signatures and that the signers need not be registered voters. They have not been in any fashion misled or lulled into the positions they now take. The Committee had a responsibility as well as the Secretary. It is not a one-way street whereby the Secretary should bear the outcome of an initiative effort placed in motion by the Committee.

 The argument is made that the constitutional and statutory provisions before us should be construed liberally. There is no statutory provision for liberal construction. Section 8–1–103(a)(i), W.S. 1977, provides the rule of construction for statutes unless "plainly contrary to the intent of the legislature: (i) Words and phrases shall be taken in their ordinary and usual sense \* \* \*." By a liberal interpretation, it is only meant that words should not be forced out of their natural meaning and should receive a fair and reasonable construction so as to obtain the objects for which a statute is designed. Liberal construction does not require that words be forced out of their natural meaning. *First National Bank & Trust Company of Wyoming v. Brimmer,* Wyo., 504 P.2d 1367 (1973). The effect of the claimed liberal construction would be to eliminate from our statute the mandatory review by the Secretary.

 The argument is made by the Committee that the statutes implementing the constitutional provisions are inconsistent with the language of the constitution in that the latter requires the signatures of "qualified voters" whereas the statutes require signatures of "qualified registered voters." The Committee cites *State ex rel. Keefe v. McInerney,* supra, as standing for the proposition that the registration is not a substantive qualification entitling a citizen to vote. We have heretofore distinguished the *McInerney* case in the light of different statutory language. The Wyoming Constitution itself defines a qualified voter, Art. 6, § 12, Wyoming Constitution:

"No person *qualified* to be an elector of the State of Wyoming, shall be allowed *to vote* at any general or special election hereafter to be holden in the state, until he or she shall have registered as a voter according to law \* \* \*." (Emphasis added.)

No registration, no vote; no one is a voter unless registered. A person is not a qualified *voter* until registered, though otherwise qualified.

 Raising of this point erects a constitutional question. When presented with a constitutionally based challenge to a statute, this court presumes the statute to be

constitutional unless the party mounting the challenge proves otherwise. *Nickelson v. People,* Wyo., 607 P.2d 904 (1980). This is because there exists a strong presumption in favor of constitutionality. *Sorenson v. State,* Wyo., 604 P.2d 1031 (1979). Any doubt in the matter must be resolved in favor of the statute's constitutionality. Before we strike down a statute, we must find that it clearly violates one of the principles of our state constitution, by which we are bound. *Washakie County School District Number One v. Herschler,* Wyo., 606 P.2d 310 (1980), cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28.

Registration is the procedure by which the qualifications of a voter are ascertained.[5] The qualifications for suffrage are set forth in Art. 6, Wyoming Constitution:

Section 2:

"Every citizen of the United States of the age of 21 years and upwards, who has resided in the state or territory one year and in the county wherein such residence is located sixty days next preceding any election, shall be entitled to vote at such election, except as herein otherwise provided." (There is no longer durational residential requirements for electors. Since ratification of the 26th Amendment to the United States Constitution, twenty-one should read eighteen.)

Section 5:

"No person shall be deemed a qualified elector of this state, unless such person be a citizen of the United States."

Section 6:

"All idiots, insane persons, and persons convicted of infamous crimes, unless restored to civil rights, are excluded from the elective franchise."

Section 9:

"No person shall have the right to vote who shall not be able to read the constitution of this state. The provisions of this section shall not apply to any person prevented by physical disability from complying with its requirements." (The Federal Voting Rights Act Amendment of

1970 prevents the use of a test or device as a condition to voting.)

▇ We must read and examine the constitution in pari materia with all its provisions. Every statement in the constitution must be interpreted in light of the entire document rather than as a sequestered pronouncement. *State ex rel. Whitehead v. Gage,* Wyo., 377 P.2d 299 (1963); *Bower v. Big Horn Canal Ass'n,* 77 Wyo. 80, 307 P.2d 593 (1957). We therefore must view all these constitutional provisions with Art. 6, § 13, Wyoming Constitution: "The legislature shall pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Initiative and referendum relates to the elective franchise.

The purpose of statutory controls with respect to initiative and referendum is to safeguard and facilitate the use of the initiative and referendum for the benefit of the people of the state by discouraging fraud and abuse and minimizing mistakes that might occur in the use of the right, as well as facilitating the checking of petitions. *Direct Sellers Ass'n v. McBrayer,* 109 Ariz. 3, 503 P.2d 951 (1972); *Dawson v. Meier,* N.D., 78 N.W.2d 420 (1956); *Headley v. Ostroot,* 76 S.D. 246, 76 N.W.2d 474 (1956).

We hold that there is no inconsistency between the constitutional language "qualified voter" and statutory language "qualified registered voter." They are synonymous.

▇ The Committee presents issues in its cross appeal in anticipation that the proceedings are governed by the Administrative Procedure Act. The Committee asserts that the Secretary should have adopted rules to implement the constitutional and statutory provisions relative to initiative and referendum and that she should have explained the manner in which she arrived at her decision.

The legislature has set forth a specific method for judicial review separate and

---

5. See § 22–3–101, et seq., W.S.1977 for the detailed procedures for registration.

apart from the method under the Administrative Procedure Act. The specific procedure is obviously in lieu of a mandamus or prohibition action, which otherwise would be the standard method to enforce and prevent action by the Secretary in this respect.

Nothing appears in Art. 3, § 52, Wyoming Constitution or § 22–24–101, et seq., W.S.1977, pertaining to initiative and referendum authorizing the Secretary to make rules. The constitutional provision, § 52(f), requires the legislature to prescribe "additional procedures," which it did. We consider the constitution, coupled with the statutes, to be self-executing. Self-executing legislation requires no act of implementation. *Jones v. Buford,* 71 N.J. 433, 365 A.2d 1364 (1976). A clear statutory direction is enforceable by an agency in accordance with its plain meaning without promulgation of a rule. *Equitable Life Mortgage and Realty Investors v. New Jersey Division of Taxation,* 151 N.J.Super. 232, 376 A.2d 966 (1977).

Section 22–24–110, W.S.1977 directs the Secretary to "prescribe the form of and prepare" the petitions. After setting forth requirements for the petitions, it authorizes her to include "[o]ther specifications necessary to assure proper handling and control." Pursuant thereto, the Secretary provided a place on the form for printing the names of the signatories.

The Committee never complained about the form or manner in which the petitions were delivered to them. They conform to the statutory format. We are unable to determine in what way the Committee was prejudiced by any lack of rules, even if required. When a procedure is detailed by statute, failure to adopt rules must be shown as prejudicial. *Jergeson v. Board of Trustees of School District No. 7, Sheridan County,* Wyo., 476 P.2d 481 (1970).

The Committee contends that the validation procedure conducted by the Secretary was arbitrary, capricious, and characterized by an abuse of discretion. Arbitrary and capricious action on the part of an executive officer is willful and unreasoning action without consideration and in disregard of facts and circumstances. *Marathon Oil Co. v. Pan American Petroleum Corp.,* Wyo., 473 P.2d 575 (1970). The Secretary made every reasonable effort possible to validate signatures that were doubtful and validated signatures that should not have been. As previously noted, any discretion exercised by the Secretary was favorable to the Committee. One cannot complain on appeal of decisions in their favor. *Johnson v. Golden,* 6 Wyo. 537, 48 P. 196 (1897). Combining these considerations favorable to the Committee and the fact that the Secretary was acting within her statutory authority, which we have heretofore discussed, we hold the Secretary's action in all respects to be reasonable and proper and not arbitrary and capricious.

The district court is reversed and the determination of the Secretary reinstated.

ROSE, Chief Justice, dissenting.

I am compelled to dissent in this case because I am in agreement with District Judge Johnson's conclusion that the Secretary of State acted outside the scope of her authority in canvassing the petitions filed by the appellees. I am also deeply concerned with the future impact that the court's reversal will have on the initiative and referendum powers reserved to the people of Wyoming by Art. 3, § 52 of the Wyoming Constitution.[1] As I view it, the

1. Article 3, § 52 of the Wyoming Constitution guarantees:

"(a) The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum.

"(b) An initiative or referendum is proposed by an application containing the bill to be initiated or the act to be referred. The application shall be signed by not less than one hundred (100) qualified voters as sponsors, and shall be filed with the secretary of state. If he finds it in proper form he shall so certify. Denial of certification shall be subject to judicial review.

"(c) After certification of the application, a petition containing a summary of the subject matter shall be prepared by the secretary of state for circulation by the sponsors. If signed by qualified voters, equal in number to fifteen per cent (15%) of those who voted in

majority opinion has the effect of impairing the right of Wyoming citizens to express themselves as a citizen's legislature through initiative and referendum, which process constitutes the purest and highest form of a democracy. This the majority does by approving the assumption of powers by the Secretary of State that were not intended by the legislature to be vested in that office, and which are not authorized by applicable law.

At the outset, I cite a general rule which has long been recognized as the foundational principle for guiding courts in reviewing cases involving the people's initiative or referendum powers. The Alaska Supreme Court in *Boucher v. Engstrom*, Alaska, 528 P.2d 456, 462 (1974), said:

"In reviewing an initiative prior to submission to the people, the requirements of the constitutional and statutory provisions pertaining to the use of initiatives should be *liberally construed* so that 'the people [are] permitted to vote and express their will on the proposed legislation * * * all doubts as to technical deficiencies or failure to comply with the

the preceding general election and resident in at least two-thirds (⅔) of the counties of the state, if [sic] may be filed with the secretary of state.

"(d) An initiative petition may be filed at any time except that one may not be filed for a measure substantially the same as that defeated by an initiative election within the preceding [five] (5) years. The secretary of state shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty (120) days after adjournment of the legislative session following the filing. If, before the election, substantially the same measure has been enacted, the petition is void.

"(e) A referendum petition may be filed only within ninety (90) days after adjournment of the legislative session at which the act was passed, except that a referendum petition respecting any act previously passed by the legislature may be filed within six [(6)] months after the power of referendum is adopted. The secretary of state shall prepare a ballot title and proposition summarizing the act and shall place them on the ballot for the first statewide election held more than one hundred eighty (180) days after adjournment of that session.

exact letter of procedure will be resolved in favor of the accomplishment of that purpose.' * * *" (Emphasis added.) Citing from *Cope v. Toronto,* 8 Utah 2d 255, 332 P.2d 977, 979 (1958).

This rule has, as its intended purpose, the recognition of the proposition that the constitutional guarantee of initiative and referendum insures that "the power of the people to legislate is as great as the power of the legislature to legislate." *Iman v. Bolin,* 98 Ariz. 358, 404 P.2d 705, 709 (1965). Therefore, the courts generally agree that constitutional and statutory provisions pertaining to the initiative and referendum process are to be construed in favor of the general right of citizens to vote on proposed measures whenever possible. See: *Rousso v. Meyers,* 64 Wash.2d 53, 390 P.2d 557 (1964); *State ex rel. Morris v. Marsh,* 183 Neb. 502, 183 Neb. 521, 162 N.W.2d 262 (1968). We said as much in *State ex rel. Benham v. Cheever,* 71 Wyo. 303, 257 P.2d 337 (1953), where, in discussing the right of city residents to petition for a vote on whether to adopt the city manager form of government, this court said:

"(f) If votes in an amount in excess of fifty per cent (50%) of those voting in the preceding general election are cast in favor of adoption of an initiated measure, the measure is enacted; if votes in an amount in excess of fifty per cent (50%) of those voted in the preceding general election are cast in favor of rejection of an act referred, it is rejected. The secretary of state shall certify the election returns. An initiated law becomes effective ninety (90) days after certification, is not subject to veto, and may not be repealed by the legislature within two (2) years of its effective date. It may be amended at any time. An act rejected by referendum is void thirty (30) days after certification. Additional procedures for the initiative and referendum may be prescribed by law. "(g) The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, enact local or special legislation, or enact that prohibited by the constitution for enactment by the legislature. The referendum shall not be applied to dedications of revenue, to appropriations, to local or special legislation, or to laws necessary for the immediate preservation of the public peace, health, or safety."

"* * * In that connection, it seems to us that any type of initiative or referendum accorded to the voters by the legislature or by the Constitution is a right which should be liberally construed to provide the voters a right to speak. No technical inhibitions and prohibitions should be set up by administrators to whom such requests are by law submitted. If the request proves inherently bad for the City, the voters can so decide at an election. If the 'petition' is legally imperfect, the city officials may challenge its validity in the courts, but should not be permitted to defend it by mere inertia." (Emphasis added.) 257 P.2d at 341.

The above-discussed proposition should be the foundation for any statutory interpretation made in the present case, although it is my fear that the majority opinion pays it little heed.

The question for resolve in this appeal pertains solely to the scope of the Secretary of State's powers as vested by § 22–24–116(a)(i), W.S.1977. That statute provides in relevant part:

"(a) Within not more than sixty (60) days of the date the petition is filed, the secretary of state shall review it and shall notify the committee whether the petition was properly or improperly filed. The petition shall be determined to be improperly filed if:

"(i) There is an insufficient number of signatures of qualified registered voters;"

Our singular concern has to do with the Secretary of State's duty to review the filed petitions in order to determine whether or not they contain a sufficient *number of signatures* of "qualified registered voters" to equal the constitutionally mandated "fifteen per cent (15%) of those who voted in the preceding general election." Article 3, § 52(c) of the Wyoming Constitution, supra, n. 1.

In addressing the issue appellant Secretary of State argues that, through § 22–24–116(a)(i), she is vested with discretionary powers to review each petition in order to determine its sufficiency or insufficiency, and, in the exercise of her discretion, it is proper for her to make factual determinations with respect to the validity of signatures appearing thereon. The appellant further argues that, since § 22–24–116(a)(i) grants her discretion, the legislature did not intend for a presumption of validity to attach to the petition's signatures.

The appellee Committee, on the other hand, urges that the duty outlined in § 22–24–116(a)(i) is a ministerial one and the Secretary of State therefore has no authority to exercise discretion with respect to which signatures will be counted and which will not, on any grounds save whether or not the signer appears to be a registered voter in the state of Wyoming. With respect to her canvass of the names on the petition, the appellee Committee goes on to point out that a presumption of validity attaches to petitions that are properly verified and the Secretary of State is not empowered, nor is she the proper party, to question or rebut the presumption.

In ruling on the merits, Judge Johnson, I think correctly, found generally in favor of the Committee's position. He determined that the duty of the Secretary of State outlined in § 22–24–116(a)(i) was of a ministerial nature involving no discretion and that the Secretary of State had, in this dispute, acted in excess of her delegated authority. The trial judge then discussed the applicability of the general rule [2] that a

---

**2.** The trial court relied on the following quotation from 42 Am.Jur.2d, Initiative and Referendum, § 54 (1969):

"If the question of the validity of the petition is properly raised, *a court* may take evidence on the question.

"There is a presumption that petitions that have been circulated, signed, and filed are valid, and the burden of proof to show their invalidity rests upon those protesting against them.

"In the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, the names on a petition properly verified are presumed to be genuine. This presumption has been said to arise from the required verification of the signatures under oath and from the criminal sanctions on placing an improper signature on such a petition.

presumption of validity attaches to signatures appearing on properly verified petitions and therefore the Secretary of State had no authority to disregard them. In discussing this he concluded in his letter opinion:

"* * * As noted in the previous quotation from Am.Jur.2d, the administrative officer does not have authority to challenge signatures. The challenge of signatures it is interesting to note in this proceedings is frequently not on the basis of whether or not the individuals are registered, but as previously indicated in testimony appearing in the transcript, *whether or not the individual used the proper name, used initials, used a nickname, improperly used a married name, changed address within the county of registration without notification, was illegible in the manner that he signed his signature, etc. All of these issues go into the underlying question of illegality or impropriety, rather than the fact of qualification or registration.* Additionally, the record would indicate that further investigation in many instances would have revealed the qualification of the individual signer. This is a problem which the Court is uniquely capable of resolving with its authority to receive evidence and make findings.

"The respondent-state next argues the express legislative provisions in Wyoming for verification and the criminal penalties and warning on the petitions have insufficient deterrent quality to entitle the petitions to a presumption that they contain valid signatures. The state argues that if no systematic check of petitions is made by the Secretary of State, how are violations to be discovered and prosecuted? It is interesting to note that so far as this Court is aware no prosecutions have been initiated as a result of the investigation here. The answer to the State's question is simple and in a court proceedings by those who are opposing

the initiative proceedings the evidence of fraud, abuse and mistake may be brought out and as a matter of public record could then be proceeded upon by the County Attorney's Office. Whether prosecutorial officials might wish to proceed is, of course, another matter.

"The State next contends that the sampling process revealed or overcame any presumption of validity; however, the sampling process was in itself an examination of underlying problems. One might even speculate that the verification process selected by the Secretary's office in and of itself indulges in certain presumptions as to the validity of the registration. Testimony reflected in the transcript would indicate there are substantial questions existing in this case about registration and whether or not the signator must be registered at the time of signing, at the time of verification, what list should be relied upon by the Secretary (either 1980 or 1981), whether or not certain defects should have been waived (failure of sponsors to be registered, failure to notarize petitions). Waived here. The practical effect of the proceedings was to find approximately five thousand signatures to be invalid without substantial opportunity in a court proceedings to resolve the issues arising as to those signatures. The petitioners, instead, were granted four days spent from nine o'clock in the morning until seven o'clock at night to review the record composed of the petitions in this matter. No further hearing was granted by the Secretary's office and as a result the matter comes before the Court on the issues here discussed and with some evidence having been presented at a hearing on May 10, 1982. It appears that in the limited time afforded to the petitioners by the state certain of the signatures previously found to be invalid were in fact valid. *If the act of the Secretary's office is purely ministerial in nature, not requiring proce-*

"Because of the presumed validity of signatures on a verified petition, an administrative officer has no authority to challenge signatures, *but must file* a properly verified peti-

tion and *leave to the court* the determination of fraud, forgery, and illegality." (Emphasis added.)

*dures being established and proceedings taking place under the Wyoming Administrative Procedures Act as has been suggested here, then it would seem appropriate that the actions of the Secretary be restricted to strictly ministerial matters. Accordingly, the petitions should have been presumed valid. Mr. Weber is directed to prepare an order in this matter to be approved as to form by the office of the Attorney General before signature by the Court." (Emphasis added.)*

I agree with these observations and conclusions.

I would have held that the trial judge correctly determined that the Secretary of State's duties under § 22–24–116(a)(i) are ministerial. It is also interesting to note that the majority opinion discusses the possibility of an identical conclusion. Thus, the essential question to be answered is: Does the Secretary of State have discretion in these matters or are her duties ministerial in nature?

In *Oyler v. State,* Wyo., 618 P.2d 1042 (1980), we said that a public officer's duty is to be construed as ministerial when:

"' * * * it is absolute, certain, and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion. * * *'" 618 P.2d at 1049.

Applying this language to that contained in § 22–24–116(a)(i), it is readily apparent that the legislature intended that the Secretary of State would simply function as a counter, tabulator, or canvasser in the process of determining whether or not properly filed and verified petitions contained a sufficient or insufficient *number of signatures* of qualified registered voters. This conclusion is borne out by the fact that § 22–24–

114(a)(iii), W.S.1977, specifically notes that petitions not properly verified are not to be counted.[3] The fact that the legislature utilized the word "review" in § 22–24–116(a) is of no particular significance, in my opinion, since such term was limited by the language which focuses that review on two areas—one being the duty to determine whether the petitions contain an *"insufficient number* of signatures of qualified registered voters" (emphasis added), and the other to determine whether "[t]he subscribers were not resident in at least two-thirds of the counties of the state." See: § 22–24–116(a)(i) and (ii), supra. The Secretary of State readily admits that the second duty encompasses a ministerial act, but alleges that discretion necessarily attaches to the first. I cannot agree.

A similar question was addressed by the Supreme Court of Missouri in *State ex rel. Kemper v. Carter,* 257 Mo. 52, 165 S.W. 773 (1914), where the court, in determining whether or not the secretary of state was performing a ministerial duty in canvassing filed petitions, reached the following conclusions:

" * * * It was so ruled in Oklahoma, notwithstanding there are some slight differences in the statutes of Oklahoma, as compared to ours, which differences have the effect of imposing, upon the Secretary of State of Oklahoma, duties which call for the exercise of a modicum of discretion. For example, in the latter state, touching a referendum petition, duties are enjoined upon the Secretary which involve, it is said: 'The power to receive protests against the sufficiency of the petitions, and to hear evidence and argument in support thereof, and to determine the sufficiency of the petitions involve the power to find facts and require the exercise of judicial or quasi judicial powers.' *Norris v. Cross,* 105

---

**3.** Section 22–24–114(a)(iii) provides:

"(a) Before petition is filed, it shall be verified by the sponsor who personally circulated it. The verification shall be in affidavit form and shall state in substance that:

 * * * * * *

"(iii) To the best of his knowledge, such signatures are those of the persons whose names they purport to be. *In determining the sufficiency of the petition, the secretary of state shall not count signatures on petitions not properly verified.*" (Emphasis added.)

Pac. loc. cit. 1010. We have no such provision in our statute. The duties of the Secretary of State as to filing a referendum petition and dealing therewith are with us purely ministerial. Sections 6748–6754, R.S. 1909.

"If these cases and holdings do not settle this point upon well-known principles of law and beyond cavil and against the contentions of relator, then a cursory reference to the provisions of our statutes indubitably does settle it.

"It will be seen that the sole question to be determined by our Secretary of State, before he files a verified referendum petition offered to him for filing, is to ascertain whether such petition has been signed by 5 per cent. of the voters in each of two-thirds of the congressional districts of the state (section 6748, supra), as shown by the vote cast in the last preceding election for the office of judge of the Supreme Court. Section 57 of article 4, Const. of Mo. This duty to so far examine and determine is enjoined upon him by fairly clear inference, but manifestly it involves more of arithmetic than it does of discretion, either judicial or other sort. Likewise it is manifest that ordinarily he will be able to determine these two facts from an inspection but little more than casual, and which may fall far short of requiring an immediate and certain count of the whole number of signers upon the petition presented. * * *" 165 S.W. at 780.

Essentially the Missouri court was relying on the fact that the constitution and statutes relating to initiative and referendum procedures made no provision for the taking of evidence by the secretary of state before performing his duties. The court, therefore, concluded that obviously the duty was purely ministerial in nature. A similar conclusion was also reached by the Supreme Court of Michigan in *People ex rel. Wright v. Kelly*, 294 Mich. 503, 293 N.W. 865 (1940), where the court stated:

" * * * The overwhelming weight of authority is, that the duties of the secretary of state are ministerial only and that he may not conduct an independent investigation to determine the genuineness of the signatures. * * *

* * * * * *

"When the secretary of state is given the power to conduct investigations, particularly when the legislature has not provided machinery for a speedy determination of the sufficiency of the petitions, long and tedious arguments unduly delay the presentation of the measures to the electorate. Ewing, 'Sufficiency Certification of Initiative Signatures in Oklahoma,' 31 American Political Science Review, p. 65; *Associated Industries v. Oklahoma Tax Commission,* supra. It is significant that, out of the 21 jurisdictions where the referendum has been adopted, only two States by Constitution, and two by statute, have given the secretary of state quasi-judicial power. Arkansas Constitution, Amendment No. 7; North Dakota Constitution, art. 2, § 25; Oklahoma Compiled Statutes 1921, § 6631, 34 Okl.St.Ann. § 8; 3 Colorado Statutes 1935, ch. 86, § 6. The overwhelming majority of the States provide by statute that either the county clerks, the circuit courts, or the State ballot commission shall test the genuineness of the petition. In order that there will not be undue delay and that the sufficiency of the petition will be speedily determined, the statutes provide that hearings must be commenced within a certain time, finished as quickly as possible, and that either party may apply to the Supreme Court where the case is to be advanced upon the docket and disposed of with as much speed as is practical. 2 Oregon Code Annotated 1930, §§ 36–2004, 36–2005; 3 Colorado Statutes 1935, ch. 86, § 6; Struckmeyer's Revised Code of Arizona 1928, § 1744; 2 Missouri Revised Statutes 1929, ch. 62, § 10705, Mo.St.Ann. § 10705, p. 4274; Nebraska Compiled Statutes 1929, § 32–1905; Baldwin's Ohio Code 1934, §§ 4785–175 to 4785–183. It is for the legislature, and not the court, to establish the machinery by which the genuineness of signatures may be determined." (Footnote omitted.) 293 N.W. at 870–871.

As can be seen, the Michigan court was also concerned with the fact that the procedures failed to require some process for the taking of evidence before the secretary of state's canvass was made. I would also refer to the California case of *Boggs v. Jordan,* Cal., 204 Cal. 207, 267 P. 696 (1928), where the court held that even though the county clerks and registrars were authorized to compare voting registration lists with the names appearing on petitions, such a duty was clearly ministerial. The court reasoned as follows:

"It is the duty of the county clerk or the registrar of voters under the Constitution to examine the petition filed in his office and to 'determine from the records of registration what number of qualified electors has signed the same.' Const. § 1, art. 4. It may be assumed that it is also his duty to see that the petition filed with him meets the requirements of the Constitution and of section 1083a of the Political Code. But when, as in the case at bar, a petition has been filed in his office which is regular in form and substance and appears on its face to be in conformity with the law, and he has examined the same and has determined from the records of registration what number of qualified electors has signed the same, and has made and attached to the petition his certificate showing the result of his examination, and has transmitted the petition and his certificate to the secretary of state, his duties in the premises have been fulfilled. His duties are ministerial, and he has no authority to go beyond the face of the petition or to resort to extraneous evidence to determine the contents of the petition. [Citations.]" 267 P. at 699.

From the above authorities it is evident that the general rule with regard to an official's duty to scrutinize a properly filed initiative or referendum petition is that such duty is ministerial unless some procedure is contained in the statutes for the taking of evidence and filing of protests before the administrative official. In light of this, I am of the opinion that § 22–24–116(a)(i) must be construed as delegating a simple ministerial counting task to the Secretary of State.

As noted previously, the majority of this court have determined that § 22–24–116(a)(i) only authorizes the Secretary of State to exercise a clearly delineated ministerial task; however, they also conclude that such task permits the Secretary to go behind the face of the petition for purposes of challenging or disregarding certain signatures. Thus, although the majority opinion holds that the Secretary of State is acting in a ministerial capacity, it also reaches the conclusion that her duty involves the exercise of discretion. To say that a task is ministerial in nature but it calls upon the performer to exercise discretion is a contradiction in concepts. These inherently different doctrines cannot be reconciled and when the majority tries to do so, the incongruous result becomes exhibit A for the proposition that the answer to the dilemma lies in the admission that there must be a presumption of validity which attaches to signatures appearing on a properly verified petition.

## WHEN AND WHY DOES THE PRESUMPTION ARISE?

Most jurisdictions in the United States have recognized that, in light of the purposes to be served by initiative provisions, the law will presume that a signature appearing on a properly verified petition is valid. The reasons for the presumption stem directly from the procedural safeguards contained in either constitutional or statutory provisions. It was said in *In re Initiative Petition No. 23, State Question No. 38,* 35 Okl. 49, 127 P. 862 (1912):

"Those who circulate the petition will necessarily be drawn from the ranks of volunteers or those who, for a very small consideration, call attention to their fellow citizens to the measure proposed, and solicit their interest therein. Necessarily even with the best safeguards that can be thrown around the circulation of petitions, where such a large number of names are required, inaccuracies and technical departure from prescribed forms are certain to occur every time a

petition is circulated. The people who sign the petitions often, if not generally, lack both convenience and the best writing materials to distinctly, legibly, and permanently attach their names thereto. All of these things are proper to be noted and taken in consideration in the administration of this law. It can be made effective or defeated by the officers charged with its administration, and it is our duty to sustain it, rather than destroy, if it can be accomplished within the law. The presumption is that petitions which are circulated, signed, and filed are valid. People interested as the circulators of these petitions, and the others who sign them, are acting in the capacity of legislators. They are members of the largest legislative body in the state, and, where so acting, do so in a public or at least a quasi public capacity, and when so acting the law presumes the validity and legality of their acts, and even though it should be claimed that they were acting simply in a private capacity, until overcome by proof, their acts, involving the performance of ministerial or administrative duties, such as those performed in the circulation and signing of these petitions, are presumed to be legal and not fraudulent. "Such is the holding of the Supreme Court of the Territory of Oklahoma in the case of *Watkins v. Havighorst,* 13 Okl. 128, 74 Pac. 318, following the case of *Board of Education v. Boyer,* 5 Okl. 225, 47 Pac. 1090, wherein the court in the syllabus said: 'The law presumes the validity and regularity of the official acts of public officers within the line of their official duties, as it does the legality of acts of private persons, and this presumption obtains until overcome by proof as to the acts involving the performance of ministerial or administrative duties, except in cases where it is sought to take away personal rights of a citizen or deprive him of his property, or place a charge or lien thereon.' The statute provides (section 3675, Comp. Laws 1909): 'Each initiative petition and each referendum petition shall be duplicated for the securing of signatures, and each sheet for signatures shall be attached to a copy of the petition. Each copy of the petition and sheets for signatures is hereinafter termed a pamphlet. *On the outer page of each pamphlet shall be printed the word "warning" and underneath this in ten point type the words, "It is a felony for any one to sign an initiative or referendum petition with any name other than his own or knowingly to sign his name more than once for the measure or to sign such petition when he is not a legal voter.* * * * *"' ,

"*The presumption above noted is further strengthened by the stringency of the provisions of this act. People are not presumed on mere conjecture, with no semblance of proof, to have committed felony by wholesale, especially with the act denouncing it staring them right in the face. These petitions, therefore, and the signatures thereto, are presumed to be valid,* and the presumption obtains on the filing of the objections in the office of the Secretary of State that those who have signed them are legal voters of the state of Oklahoma, and this is the one provision that is the sine qua non, the substantial material element necessary in every case to constitute a valid signature, and the burden of proof to overcome this presumption should be and is, in every instance, upon the protestant, and, in the absence of any evidence of fraud, forgery, or other improper or wrongful conduct in securing the signers to the petitions sufficient to throw discredit upon the entire petition or upon a sufficient number, the same, in keeping with the presumption above noted, will be held valid. We do not mean to hold that the circulator's affidavit can be dispensed with, but that technical defects therein will not destroy the petition. * * *" (Emphasis added.) 127 P. at 866–867.

There, the court relied upon the fact that each person who signed knew that it was a crime to do so if he or she was not a qualified voter of the state. In other words, the courts have recognized that a signer would be guaranteeing his or her

qualifications to participate in the initiative process. Other courts have also relied on the fact that one of the procedural safeguards generally required is that each petition should inform the signer of the criminal penalties associated with forging a signature, signing twice, or placing his or her name on the petition when the individual is not a registered voter. *State ex rel. Morris v. Marsh,* supra, 162 N.W.2d at 267; *Rousso v. Meyers,* supra. In other instances the courts have held that the presumption arises because the circulators of an initiative provision are required to establish by affidavit the verity of signatures appearing thereon. See: *Direct Sellers Association v. McBrayer,* 16 Ariz.App. 231, 492 P.2d 727 (1972), vacated on other grounds 109 Ariz. 3, 503 P.2d 951 (1972); *State ex rel. McNary v. Olcott,* 62 Or. 277, 125 P. 303, 307 (1912).

In my opinion, the above-cited cases stand for the proposition that, under the Wyoming constitutional and statutory scheme for initiative and referendum measures, a presumption of validity attaches to all signatures appearing on a properly filed and verified petition. I say this because, pursuant to the powers granted by Art. 3, § 52(f) of the Wyoming Constitution,[4] the legislature insured that, by the time the signed petitions were submitted to the Secretary of State, certain procedures would be followed to protect against fraud, forgery and abuse. In § 22–24–111, W.S.1977,[5] the legislature provides that each circulated petition must include a warning to each individual that certain acts on his part will constitute a crime. Included within this warning is the requirement that the individual be a "qualified registered voter" at the time of signing. Then, through § 22–24–114, W.S.1977,[6] the legislature has required that before filing any petition the circulator thereof must include an affidavit verifying (1) that he was the only circulator of that petition; (2) that all signatures on the petition were made in his presence; and (3) that to the best of his knowledge the signatures represent the persons whom they appear to represent. Thus, when the petitions are filed with the Secretary of State so that she may discharge the duties described by § 22–24–116(a)(i), the signers have been made aware of the fact that they must be a "qualified registered voter" and the circulator has verified that all signatures were made in his or her presence and that to the best of his or her knowledge the person who signed is the person he or she purports to be. These procedures were not intended to be without substance, but rather were intended to protect against fraud, forgery, and abuse in order to guarantee, insofar as the Secretary of State is concerned, the legality of the petitions. Because of these safeguards, the presumption of validity arises. Also, in my opinion, the presumption of validity arises because, at the time of signing, the individual knows it is illegal to sign a petition if he or she is not a registered voter, and when the signer affixes his or her name to the petition, we must assume the individual acts within the law. As was referenced previously:

" * * * People are not presumed on mere conjecture, with no semblance of proof, to

4. Supra, n. 1.

5. Section 22–24–111, W.S.1977, states:
 "Each petition shall include a statement of warning that a person who signs a name other than his own on the petition, or who knowlingly [sic] signs his name more than once for the same proposition at one (1) election, *or who signs the petition knowing that he is not a qualified registered voter,* upon conviction, is punishable by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one (1) year or both." (Emphasis added.)

6. Section 22–24–114, W.S.1977, provides:

"(a) Before petition is filed, it shall be verified by the sponsor who personally circulated it. The verification shall be in affidavit form and shall state in substance that:
 "(i) The person signing the affidavit is a sponsor and is the only circulator of that petition;
 "(ii) The signatures on the petition were made in his presence; and
 "(iii) To the best of his knowledge, such signatures are those of the persons whose names they purport to be. In determining the sufficiency of the petition, the secretary of state shall not count signatures on petitions not properly verified."

have committed felony by wholesale, especially with the act denouncing it staring them right in the face. These petitions, therefore, and the signatures thereto, are presumed to · be valid, and the presumption obtains on the filing of the objections in the office of the Secretary of State * * *." *In re Initiative Petition No. 23, State Question No. 38,* supra, 127 P. at 866.

In light of this conclusion, I place no significance on the appellant's argument that a presumption is not present because the circulator does not have to verify that the signature is that of a registered voter, because clearly the legislature deemed the warning contained in § 22–24–111 as sufficient to cover this matter.

Now that I have established, at least for me, that the case law supports a conclusion that a presumption of validity attaches to the signatures appearing on petitions that are properly filed and verified with the Secretary of State, it becomes important to discuss how the presumption operates with respect to the Secretary of State's duty previously outlined in § 22–24–116(a)(i).

I recognize, of course, that in making her count the Secretary of State is faced with a formidable task in cases like the present where petitions containing over 30,000 signatures are filed. However, here is where the presumption comes into play, and the Secretary of State is then relegated to the function of comparing applicable voter registration lists with the signatures appearing on the petitions. This point was discussed in *State ex rel. Kemper v. Carter,* supra:

"We are not saying that the Secretary of State must file a referendum petition upon which either there is not enough congressional districts represented by the signers thereon, or not enough signers from such or any of such districts. But, where prima facie all of these facts appear, he must file the petition as presented to him, and leave to the courts the

determination of questions of latent fraud, forgery, and hermetic illegality, for which determination our statutes, it would seem, have provided full and ample machinery for every condition and contingency, and for the protection and safeguarding of both protagonists and antagonists of the act sought to be referred. Clearly the warning provided for by statute, which recites that a breach of the law as to a referendum petition constitutes a felony, and the careful provisions for verification of the states facts as to residence, names, and qualifications of signers, indicate that these provisions were deemed such adequate safeguards against fraud and forgery as that compliance therewith, showing prima facie sufficiency and regularity, was intended to import such sufficient verity to the Secretary of State as to make it his duty to file petitions bearing such legal indicia when such were presented to him for filing." 165 S.W. at 781.

Likewise, I am not suggesting that the Secretary of State merely had to count the number of signatures submitted without some investigation. Nor can it be said that the trial judge did not recognize the Secretary of State's duty to compare the petitions with registration lists. However, the inquiry delegated to the Secretary of State by § 22–24–116(a)(i) in conjunction with the presumption only permits her to invalidate a signature if the name in question does not either appear or correspond in any respect with a name on a *statewide* registration list. This is so because the legislature has only required that a signer be a registered voter within the state of Wyoming.[7] Thus, as the trial judge concluded, it is not the role of the Secretary of State to make factual determinations concerning a signature where initials are used, or a nickname, or a surname, etc., but rather to give to these signatures the presumption of validity. In other words, the courts, recognizing the limited ministerial role of officers in

---

**7.** See § 22–24–116(a)(i), supra; also see § 22–24–113, W.S.1977, which provides:

"Any qualified registered voter may subscribe to the petition by signing his name and

listing his address. A person who has signed the petition may withdraw his name only by giving written notice to the secretary of state before the time that the petition is filed."

our Secretary of State's position, also recognize that it is not proper for the counting official to go beyond the face of the petition absent some procedure for the taking of protests. *People ex rel. Wright v. Kelly*, supra; *State ex rel. Morris v. Marsh*, supra; *State ex rel. Kemper v. Carter*, supra. The simple fact is that the Secretary of State in these circumstances is not the proper party to raise objections to signatures. This function and the accompanying burden of proving invalidity lies with the protestors. State ex rel. McNary v. Olcott, supra. I am therefore in agreement with District Judge Johnson in this case and am of the opinion that the Secretary of State acted in excess of her authority in invalidating some 4,900 signatures.

As a final thought, I would add a short discussion about a matter that has bothered me substantially since undertaking a review of this appeal. My concerns find their genesis in the fact that the appellant readily admits to not using a statewide voter registration list in making her "review" and confesses that she checked only *two* county registration lists at the most in order to determine whether a given signer was a registered voter. This two-county check was undertaken where the address as given by a signer referred to residence in another county. The problem with the entire checking process lies in the fact that many of the signers, who might have been registered voters within the state, were not found unless they gave an address for a county where they were registered to vote. With respect to this, the appellant argues that the circulators agreed to instruct the signers to give the address of registration rather than their present residence if the two addresses were different. The appellant also argues that such a condition could properly be imposed under her authority contained in § 22–24–110(a)(v), W.S.1977, which provides that she can require other specifications within the petition to "assure proper handling and control." Thus, pursuant to the agreement, she was not required to look for a particular signature on a statewide basis.

In my opinion, notwithstanding the evidence that the sponsors agreed to that outlined above, the Secretary of State, under § 22–24–110(a)(v), W.S.1977, is without authority to impose a condition which goes beyond the statutory requirements imposed by § 22–24–113 and § 22–24–116(a)(i) that the signer be a "qualified registered voter" in the state. As a general rule, the powers and duties of a public officer as prescribed by the constitution or statute are limited by specific provisions which delegate various duties. 63 Am.Jur.2d, Public Officers and Employees, § 263 (1972). Also, it is clear that an administrative officer has only those powers expressly conferred by the legislature. *McNeill v. Park County School District No. 1*, Wyo., 635 P.2d 818 (1981). Here, the statutes in question grant the Secretary of State only the power to canvass properly filed and verified petitions to determine whether they contain a sufficient number of signatures of qualified registered voters. To properly perform her duty, the Secretary of State was obligated to check all county voting lists or, in lieu thereof, a statewide voting list, and the fact that the signers may not have given their addresses where registered would have no effect on her obligation to perform that duty, nor would it obviate the need for the canvass as required by § 22–24–116(a)(i).

CONCLUSION

The statutes in question must be construed in the manner I have proposed since this is the only way that the foundational principle of "liberal construction" can be recognized and applied. The following quote best expresses my concerns:

" * * * *The right of direct legislation in the people must be administered by the officers charged with that duty in such manner as to make it operative. If technical restrictive constructions are placed upon the laws governing the initiation and submission of these measures, the purpose and policy of the people in establishing the same will be entirely defeated, and instead of becoming an effective measure for relief from evils, under which they have heretofore suffered,*

*there will be naught but an empty shell and a continuation of the conditions for which relief in this manner has been sought. The people who circulate a petition to submit for the consideration of their fellow citizens, constitutional and statutory provisions for the most part are unquestionably animated by a purpose which to them and the signers thereof, at least, appears good. \* \* \* "* (Emphasis added.) *In re Initiative Petition No. 23, State Question No. 38,* supra, 127 P. at 866.

My need to file this dissenting opinion is strong and directly results from what I believe is an unlawful intrusion on the rights of the citizens and voters of Wyoming to legislate. The majority of this court have imposed technical and prohibitive restrictions on the initiative power of Wyoming residents rather than protecting and upholding this most basic and precious right still remaining in a democratic society.